John **SHIEL**, Robinson Jones, and
John Francis, Appellants,

v.

**UNITED STATES**, Appellee.

Nos. 83–1222 to 83–1224.

District of Columbia Court of Appeals.

Argued Jan. 8, 1986.
Decided Sept. 10, 1986.

Nina Kraut, Washington, D.C., appointed by the court, for appellant Shiel.

J.E. McNeil, Washington, D.C., for appellant Jones.  Appointed by the court for appellant Francis.

John M. Facciola, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Richard A. Kaplan, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before PRYOR, Chief Judge, and BELSON, Associate Judge, and REILLY, Senior Judge.

BELSON, Associate Judge:

Appellants seek reversal of their convictions for unlawful entry[1] of the United States Capitol on the basis of their right of free speech, necessity, their good faith reasonable belief in a right to remain, and prosecutorial selectivity, vindictiveness, and misconduct. We reject their arguments, and affirm.

At approximately 1:25 p.m. on January 25, 1983, a large group of demonstrators entered the Capitol Rotunda. Within a short time, the number of demonstrators in the Rotunda swelled to several hundred. The demonstrators sat on the floor, chanted, sang, and prayed aloud.

The action of the demonstrators presented a problem for the authorities responsible for assuring the safety of the President of the United States and others planning to attend that night's State of the Union Address. The Chief of the United States Capitol Police, James M. Powell, and the United States Senate Sergeant at Arms, Howard Liebengood, became concerned that if the demonstrators refused to leave at the regularly scheduled closing time, 4:30 p.m., then the security sweep of the Capitol planned for the evening might be seriously complicated. A statute, 40 U.S.C. § 193 (1982), authorizes the Sergeants at Arms of the Senate and House of Representatives to promulgate regulations to "preserv[e] the peace and [to] secur[e] the Capitol from defacement, and for the protection of the public therein...." Pursuant to this statute, the Sergeants at Arms had issued a regulation authorizing either of them to close the Capitol at any time either determined that such closing was "necessary in order to assure the security or safety of any member of Congress, the President of the United States, Vice President of the United States, or any other person...." After consulting with Chief Powell, Liebengood exercised his authority under the regulation by ordering the Capitol closed at 2:00 p.m., rather than the regular closing time, 4:30 p.m.

The Capitol Police carried out the order to close the Capitol at 2:00 p.m. Four separate announcements that the building was closed, including at least one reading of the unlawful entry statute, D.C. Code § 22–3102, preceded the arrest of the 158 demonstrators who chose to remain in the Rotunda.

Appellants contend that their convictions should be reversed for a variety of reasons. First, appellants argue that the early closing of the Capitol violated their First Amendment right of free speech. Second, appellants insist that the trial court erred in ruling that the First Amendment issue raised by the early closing was a question of law for the court rather than a question of fact for the jury. Appellants also assert that the trial court erred in preventing them from mounting the defenses of good faith, reasonable belief in the right to remain, and necessity, and that prosecutorial selectivity, vindictiveness and misconduct warrant reversal. We find appellants' arguments unpersuasive.

■ The early closing of the Capitol passes muster as a reasonable restriction on the time, place, and manner of First Amendment expression. We reach this conclusion in light of the test enunciated by the United States Supreme Court in *United States v. Albertini*, 472 U.S. 675, 105 S.Ct. 2897, 2907, 86 L.Ed.2d 536 (1985): "an incidental burden on speech is no greater than is essential, and therefore is permissible ... so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Under the circumstances prevailing on the afternoon in question, the early closing of the Rotunda served to assure the substantial government interest in safeguarding the President of the United States and others who were planning to attend the State of the Union Address that evening. Chief Powell testified that, in the event the demonstrators refused to leave, waiting until 4:30 p.m. to close the Rotunda would have made it difficult for assigned personnel to com-

1. D.C.Code § 22–3102 (1981).

plete a security sweep of the Capitol or would have required a diversion of District of Columbia police officers away from their regular duties. Chief Powell also explained that while the removal of all of the demonstrators from the Capitol prior to processing them elsewhere might have minimized interference with the security sweep, that would have been a less effective way of preserving evidence of the arrestees' violations of the law. Thus, the government established that security in the Capitol would have been achieved less effectively had not the neutral regulation authorizing the temporary closing of the Capitol been invoked.

We are also guided by the United States Supreme Court's refusal to strike down a Park Service ban on overnight sleeping in Lafayette Park and the Mall in *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). That decision stands for the proposition that the avoidance of "a measure of actual or *threatened* damage" to park lands is a substantial government interest. *Id.* at 299, 104 S.Ct. at 3072 (emphasis added). In the instant case, the mere possibility that the demonstrators might have left the Rotunda voluntarily by 4:30 p.m. did not remove the threat of trouble at the time Chief Powell and Liebengood acted. Even if a more appropriate response to the situation could have been formulated, and the record discloses none, the validity of the early closing order "does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests." *Albertini, supra,* 472 U.S. at —, 105 S.Ct. at 2907. Hence, we reject appellants' claim that their convictions for unlawful entry violated the First Amendment.

Appellant Shiel argues that the trial court erred in treating the First Amendment issue of the validity of the early clos-

ing of the Rotunda as a question of law.[2] Before addressing this question directly, some background discussion is in order. First Amendment considerations have led this court to construe the unlawful entry statute, D.C.Code § 22–3102, to require some additional specific factor beyond the mere direction of an authorized person to leave the property in order to make a person's presence on public property illegal. *O'Brien v. United States,* 444 A.2d 946, 948 (D.C.1982) (additional factor was an unposted Washington Metropolitan Area Transit Authority regulation); *Carson v. United States,* 419 A.2d 996, 998 (D.C. 1980) (chain across White House lawn); *Leiss v. United States,* 364 A.2d 803, 806–7 (D.C.1976) (posted visiting hours), *cert. denied,* 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977); *United States v. Nicholson,* 97 Daily Wash.L.Rptr. 1213 (D.C. July 7, 1969), *aff'd,* 263 A.2d 56 (D.C.1970) (Capitol grounds statute held not properly invoked). The government argued in the trial court, as it does here, that the proper invocation of the regulation authorizing the closing of the Capitol constituted the specific additional factor in this case. Appellant Shiel did not challenge the government's right to make that argument at trial, but did object to the trial court's refusal to allow the jury to decide the validity of the order to close the Capitol as part of an overall determination of whether an additional specific factor had been proven.

■ We are persuaded that the trial court acted properly in reserving the ultimate question of the validity of the order for its own determination. The trial court properly submitted to the jury related issues of fact, such as the existence of a separate reason (that the building was closed) for requiring the demonstrators to leave, and whether they were in fact instructed to leave the Capitol on the afternoon in question. The determination of the issue of the validity of the order closing the

---

2. Appellant Francis never asked that this issue go to the jury. Appellant Jones withdrew his request that the issue be submitted to the jury.

Capitol, however, required a resolution of the legal issue of whether the First Amendment was infringed. Where the crucial underlying facts are undisputed, questions of law such as this one are appropriately within the trial court's domain. *See Dennis v. United States*, 341 U.S. 494, 511–15, 71 S.Ct. 857, 868–70, 95 L.Ed. 1137 (1951) (plurality opinion) (whether defendant's conduct is entitled to First Amendment protection is a matter of law to be resolved by the courts, not a question of fact for the jury). Here, there was no dispute that several hundred demonstrators entered the Rotunda during the afternoon immediately preceding the night of the State of the Union Address. Nor do appellants dispute that many of the demonstrators sat or knelt in the Rotunda. A large number refused to leave when directed to do so. Therefore, we discern no error here in the court's undertaking to determine, as a matter of law, that the order closing the building did not infringe the First Amendment. Our disposition of this argument does not foreclose a contrary result in a future case where disputed factual issues are bound together with the First Amendment issue.

■ Appellants insist the trial court should have instructed the jury that appellants were entitled to be acquitted if they had a reasonable, good faith belief that they had a right to remain in the Rotunda after it was closed. That position is untenable. As this court explained in *Morgan v. District of Columbia*, 476 A.2d 1128, 1133 (D.C.1984), with reference to the unlawful entry statute, the reasonable, good faith belief defense applies only where "the belief [is] based on a reasonable mistake of fact, or on a reasonable mistake as to a non-penal property law which, if not a mistake, would justify remaining on the property." Appellants' mistaken belief in a valid constitutional law defense plainly does not fall within the boundaries outlined in *Morgan*.

■ Appellant Jones further contends that the trial court erred in denying his motion *in limine* regarding the introduction of evidence supporting a necessity defense. We find no basis for reversal. This court has previously upheld a trial court's refusal to allow unlawful entry defendants to invoke a necessity defense, where "the defendants' actions were not reasonably designed to actually prevent the threatened greater harm." *Griffin v. United States*, 447 A.2d 776, 778 (D.C.1982) (demonstrators refused to leave St. Matthew's and Washington Cathedrals, which they hoped would be opened up to the homeless), *cert. denied*, 461 U.S. 967, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983). Similarly, as the trial court observed, appellant's action, ostensibly designed to convince President Reagan to open up the Capitol Rotunda or some other federal building to the homeless on the night of the State of the Union Address, do not meet the reasonableness requirement for the necessity defense.

■ Appellants Shiel and Francis urge this court to reverse their convictions because of impermissible prosecutorial selectivity.[3] Appellants argue that the United States Attorney's failure since November 1984 to prosecute persons who have demonstrated outside of the South African Embassy for violating the 500–foot rule in D.C.Code § 22–1115 (1981) bars appellants' prosecutions for unlawful entry inside the Capitol Rotunda in 1983. To restate appellants' proposition is to refute it. Appellants seek to prove selectivity in 1983 by reference to unrelated events occurring over a year later. Moreover, appellants rely on matters outside the record of this case. Accordingly, we decline to reverse on this ground.

Appellant Shiel advances a prosecutorial vindictiveness argument which we find unpersuasive.[4] Appellant argues that the

---

3. Appellant Jones chose not to press this issue on appeal.

4. Appellant Jones declined to pursue the prosecutorial vindictiveness argument on appeal. Appellant Francis failed to preserve this issue for appellant review by withdrawing from the

fact that he and four other demonstrators who elected to stand trial faced an enhanced charge, unlawful entry, D.C.Code § 22–3102 (1981), while the 153 other demonstrators who were arrested posted and forfeited collateral on the lesser charge of unlawful assembly, D.C.Code § 22–1107 (1981), requires reversal of his conviction on the grounds of prosecutorial vindictiveness. For the reasons elaborated below, we disagree.

The written motion to dismiss for prosecutorial vindictiveness, which appellant joined, stated that representatives of the Community for Creative Non-Violence (CCNV), the group that organized the demonstration, met with law enforcement officials approximately one week prior to the demonstration to discuss what types of charges would be placed against those who would participate in the action the group was planning in the Rotunda. Thereafter, the Assistant United States Attorney in charge of the misdemeanor branch of his office informed the organizers that all those who were arrested would be permitted to post and forfeit $10 collateral on the charge of unlawful assembly. If they did not do so, he advised, they would be charged with the more serious misdemeanor of unlawful entry.

There is no dispute that on the day of the demonstration a Capitol Police captain informed all of the demonstrators, by bullhorn, of their exposure to prosecution under the unlawful entry statute if they remained in the Rotunda. It is also uncontested that appellant was given the opportunity to post and forfeit $10 collateral for unlawful assembly, and thereby eliminate his exposure to the unlawful entry charge. Appellant refused to forfeit the $10 collateral he posted after his arrest for unlawful assembly. The government thereupon instituted the higher misdemeanor charge of unlawful entry.

Appellant contends that *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), as applied to the foregoing facts, mandates reversal. Specifically, appellant insists that the fact that higher charges were instituted outside of the plea bargaining context without advance individual notice of the consequences of failing to plead to the lesser charge is dispositive of this case. We decline to read *Bordenkircher* so broadly.

*Bordenkircher* establishes that the institution of higher charges in the plea bargaining context, with advance individual notice of the consequences of failing to plead to the lesser charge, comports with due process. *Id.* at 365, 98 S.Ct. at 669. *Bordenkircher* does not, however, hold that the absence of a plea bargaining context or advance individual notice necessarily renders the bringing of higher charges unconstitutional. As this court noted in *Washington v. United States,* 434 A.2d 394, 396 (D.C.1980) (en banc):

> [W]e do not read the holding in *Bordenkircher* as requiring that a prosecutor must always present to the defendant, on the record, the alternative of either entering an acceptable guilty plea or facing the consequences of enhanced charges. While that occurred in *Bordenkircher,* the Court did not require that such plea bargaining procedures must be spread on the record so that the prosecution disclose its price, if any, for the defendant's refusal to enter an acceptable guilty plea.

Our reluctance to follow appellant's suggestion that we read *Bordenkircher* to rule out the institution of a higher charge following a refusal to forfeit collateral, when no advance individual notice is given to the defendant, is reinforced by the Supreme Court's interpretation of *Bordenkircher* in *United States v. Goodwin,* 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982). We find applicable here the same policy reasons that, according to *Goodwin,* influenced the *Bordenkircher* court to reject a distinction of constitutional dimension between the dismissal of charges originally

motion to dismiss, denied by the trial court,                premised in part on this argument.

papered and the enhancing of charges after plea negotiations. *Goodwin*, 457 U.S. at 379, n. 10, 102 S.Ct. at 2492, n. 10.[5] Here, appellant urges us to discern a distinction of constitutional magnitude between the institution of higher charges with advance individual notice and their institution without such notice. To accept appellant's suggestion would be to increase the incentive for prosecutors, because the fact of advance individual notice might later be contested, to err on the side of bringing more serious charges initially, a development far from favorable to criminal defendants. For all of the reasons stated above, we decline to hold that *Bordenkircher* mandates reversal in this case.

■ There remains the question whether appellant can prevail on this issue by satisfying the test established in *Goodwin* for cases where higher charges were brought outside of the plea bargaining context. *Goodwin* stands for the proposition that, even in a context not involving plea bargaining, no presumption of vindictiveness arises out of an upward modification of charges before trial. Such a modification, without more, proves only an "opportunity for vindictiveness," not actual vindictiveness. *See id.* at 384, 102 S.Ct. at 2494. Only the latter offends due process. *Id.*

■ Like the defendant in *Goodwin*, appellant can point to no more evidence of vindictiveness than the fact that a higher charge was instituted after he insisted on a trial. *Id.* at 382 n. 15, 102 S.Ct. at 2493 n. 15. Moreover, there are countervailing indications of a lack of prosecutorial intent to be vindictive. The demonstration organizers were notified in advance of the option demonstrators would be offered to avoid an unlawful entry charge. The demonstrators themselves were notified that they could be charged with unlawful entry. Appellant chose not to forfeit collateral for unlawful assembly, despite actual notice that an unlawful entry charge would lie against him. These facts indicate that the government's attitude here, far from being impermissibly vindictive, was akin to that of the prosecutor in *Bordenkircher*, who "openly presented the defendant with the unpleasant alternatives of foregoing trial or facing charges on which he was plainly subject to prosecution." *Bordenkircher*, 434 U.S. at 365, 98 S.Ct. at 669. Our review of the record persuades us that appellant has failed to meet his burden of proving actual vindictiveness.[6]

■ Appellants' final contention, that the prosecutor's statement in closing argument that "[t]he Court has very broad discretion to deal with the question of punishment" necessitated a mistrial, is without merit.

*Affirmed.*

---

5. The footnote, in relevant part, reads:

The decision in *Bordenkircher* [434 U.S. 357, 98 S.Ct. 663] also was influenced by the fact that, had the Court recognized a distinction of constitutional dimension between the dismissal of charges brought in an original indictment and the addition of charges after plea negotiation, the aggressive prosecutor would merely be prompted "to bring the greater charge initially in every case, and only thereafter to bargain." *Id.*, at 368 [98 S.Ct. at 670] (Blackmun, J., dissenting). The consequences of such a decision often would be prejudicial to defendants, for an accused "would bargain against a greater charge, face the likelihood of increased bail, and run the risk that the court would be less inclined to accept a bargained plea." *Ibid.* Moreover, in those cases in which a defendant accepted the prosecution's offer, his reputation would be spared the unnecessary damage that would result from the placement of the additional charge on the public record.

6. Because we hold that appellant did not satisfy his burden under *Goodwin*, we do not reach the same result as *United States v. Fitzgibbon*, Nos. 85–0329, –0330, –0331 (D.C.D.C. Nov. 12, 1985), as appellants urge. That ruling of the United States District Court was entered in cases in which, so far as the unpublished opinion indicates, the government did not even attempt to warn defendants that a decision to insist on a trial would prompt the initiation of more serious charges. We observe that while we are not bound by an opinion of the United States District Court, we nonetheless accord it great respect. We need not decide here, of course, whether we would reach the same result as *Fitzgibbon* on the same facts.