Arthur T. WHEELOCK, Appellant,

v.

UNITED STATES, Appellee.

Rory D. O'DONNELL, Appellant,

v.

UNITED STATES, Appellee.

Nos. 86–1102, 86–1191.

District of Columbia Court of Appeals.

Argued Sept. 20, 1988.
Decided Dec. 21, 1988.

Mark A. Venuti, Washington, D.C., appointed by the court, for appellant Wheelock.

Dennis M. Hart, Washington, D.C., appointed by the court, for appellant O'Donnell.

Sharon A. Sprague, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., at the time the brief was filed, and Michael W. Farrell, Elizabeth Trosman, and Glenn A. Fine, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge,* and BELSON and TERRY, Associate Judges.

ROGERS, Chief Judge:

In *Shiel v. United States,* 515 A.2d 405 (D.C.1986), *cert. denied,* — U.S. —, 108

*Judge Rogers was an Associate Judge of the court at the time this case was argued. Her

S.Ct. 1477, 99 L.Ed.2d 706 (1988), the court held that the government had properly invoked a regulation authorizing the early closing of the Capitol Rotunda for the purpose of conducting a security sweep of the Capitol before the President's State of the Union Address to Congress later that evening. The court viewed the early closing order as a reasonable restriction on the time, place and manner of First Amendment expression because the government had met its burden of showing that security in the Capitol would have been less effectively achieved had several hundred demonstrators been allowed to remain in the Rotunda until the regular closing time. 515 A.2d at 408. *Shiel* left open the question of whether a lesser factual showing of need for security by the government would be sufficient to sustain invocation of the early closing regulation. We are satisfied that whatever that lesser showing might be, it was not made in the instant case and consequently the convictions of appellants Arthur T. Wheelock and Rory D. O'Donnell for unlawful entry of the Capitol Rotunda must be reversed.

I.

The Rotunda in the United States Capitol is normally used as a museum and connecting corridor between the chambers of the Senate and House of Representatives. It is a site of interest to visitors because of its historical significance and the view it offers of the painted dome ceiling. A stone slab in the center of the Rotunda marks the place where President Washington was to have been buried before he chose to be buried instead at Mount Vernon.

On Good Friday, March 28, 1986, when Congress was not in session, a group of fifty people, including appellants, entered the Capitol Rotunda around 12 o'clock noon. They sat down in a tight circle in the center of the Rotunda and began "to pray for a change of heart" on the part of Congress and the Administration on the Gramm–Rudman bill. One person stood and read aloud from the Passion of Christ.

status changed to Chief Judge on November 1, 1988.

Others sang and chanted. At the time there were about 75 to 100 tourists in the Rotunda. None of the 50 people attempted to block passage through the Rotunda or to threaten any of the tourists. Nor was the view of the dome ceiling completely blocked for tourists.

The United States Capitol Police, having been previously notified that the Community for Creative Non–Violence was planning a demonstration around midday and intended to be arrested, anticipated arresting the demonstrators and, for that purpose, Chief James J. Carvino ordered the Rotunda closed at 12:10 p.m. All of the tourists left. While the group of fifty people remained in the center of the Rotunda, Lieutenant Dean B. Wooden walked around them ten times, and, using a bullhorn, announced that the Rotunda was closed and that anyone who remained would be in violation of the law. He did not ask any members of the group to stand or to move elsewhere. Approximately thirty people then left the Rotunda. At 12:20 p.m. the remaining twenty people were arrested and charged with unlawful entry in violation of D.C.Code § 22–3102 (1981). Appellants, and three others, demanded a trial and were convicted.

## II.

■ To protect the unlawful entry statute [1] from unconstitutional vagueness and to protect First Amendment rights, this court has held that the government must prove not only that a person lawfully in charge of public premises has ordered the defendant to leave but that there is "some additional specific factor establishing the party's lack of a legal right to remain." *O'Brien v. United States*, 444 A.2d 946, 948 (D.C.1982) (citations omitted). The requirement of an independent factor is not satisfied simply by an articulable reason for restricting a person's First Amendment rights. In rejecting the government's argument that a person may be convicted of

unlawful entry even if lawfully on the premises and exercising First Amendment rights, provided the person refused to depart upon a demand to do so, the court stated in *Carson v. United States*, 419 A.2d 996 (D.C.1980), that "the constitutionality of the statute was saved precisely because 'an individual's otherwise lawful presence is not conditioned upon the mere whim of a public official.'" *Id.* at 998 (quoting *Leiss v. United States*, 364 A.2d 803, 806 (D.C.1976), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977) (citing *Shuttlesworth v. Birmingham*, 382 U.S. 87, 90, 86 S.Ct. 211, 213, 15 L.Ed.2d 176 (1965)).

■ Accordingly, the type of independent factor required to show that a person does not have a legal right to remain in a place must be in the nature of "posted regulations, signs or fences and barricades regulating the public's use of government property, or other reasonable restrictions." *Id.* In *Carson*, the independent factor was a chain separating the White House lawn from the area where tourists are allowed to enter, *id.*, while in *Leiss*, there were posted public visiting hours at the White House. 364 A.2d at 805. In describing the type of "other reasonable restrictions" that could be a sufficient independent factor, *O'Brien, supra,* held an unposted WMATA regulation, prohibiting First Amendment activities within fifteen feet of specific congested areas, to be a valid time, place, and manner restriction neutrally applied for a significant government purpose (to avoid congestion that could cause injury) and narrow in scope. 444 A.2d at 948–49. Similarly, *Shiel* held that the need to secure the Capitol in an effective manner in preparation for the President's State of the Union Address was an independent factor sufficient to invoke the regulation authorizing the closing of the Capitol for security purposes. The government contends that the early closing order in the instant case also

---

1. D.C.Code § 22–3102 (1981) provides that:
   Any person who, without lawful authority, shall enter, ... any public or private dwelling, building or other property, ... or being therein or thereon, without lawful authority to

remain therein or thereon shall refuse to quit the same on the demand ... of the person lawfully in charge thereof, shall be deemed guilty of a misdemeanor....

was a reasonable time, place and manner limitation in a public forum.[2]

It bears repeating that "[t]he general concepts of First Amendment freedom are given added impetus as to speech and peaceful demonstration in Washington, D.C., by the clause of the Constitution which assures citizens their right to assemble peaceably at the seat of government and present grievances." *A Quaker Action Group v. Morton,* 170 U.S.App.D.C. 124, 131, 516 F.2d 717, 724 (1975). The courts in this jurisdiction have long recognized that "[t]he United States Capitol is a unique situs for demonstration activity" and "is a place traditionally open to the public—thousands visit each year—to which access cannot be denied broadly or absolutely, [a fact which must be weighed] against the government's interest in protecting against possible 'damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff.'" *Kroll v. United States,* 590 F.Supp. 1282, 1289, 1290 (D.D.C.1983) (quoting *Jeannette Rankin Brigade v. Chief of Capitol Police,* 342 F.Supp. 575, 583–85 (D.D.C.), *aff'd mem.,* 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972)).

In reviewing challenges to criminal convictions as violative of the First Amendment, the Supreme Court has stated that

[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time. Our cases make clear that in assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is

involved; the regulation must be narrowly tailored to further the State's legitimate interests.

*Grayned v. City of Rockford,* 408 U.S. 104, 116–17, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972). *See also United States v. Nicholson,* 97 Daily Wash.L.Rptr. 1213 (July 17, 1969), *aff'd,* 263 A.2d 56 (D.C.1970) (appended to *Dellums v. Powell,* 184 U.S.App. D.C. 275, 305, 566 F.2d 167, 197 (1977), *cert denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978)). To determine whether an early closing order was a reasonable exercise of the government's power to regulate activity in the Capitol Rotunda, "[t]he issue is to be resolved by balancing factors such as the nature of the particular public property, the weight of the governmental interest involved, the availability of alternative avenues of expression, and the extent to which the regulation unnecessarily interferes with First Amendment right." *Leiss, supra,* 364 A.2d at 808. *See also (Marcy) Smith v. United States,* 445 A.2d 961, 965 (D.C.1982) (en banc).

The government does not, and indeed could not,[3] argue that the Rotunda could be permanently closed to the public, only that when there are concerns about security, the Capitol Police may properly invoke the early-closing regulation and arrest persons for unlawful entry when they refuse to leave the closed Rotunda. It relies on *Arshack v. United States,* 321 A.2d 845, 849 (D.C.1974), in which the court upheld convictions for willfully and knowingly obstructing passage within the United States Capitol building, stating that "[t]he governmental interest sought to be protected is plain: insuring clear passage through the

---

**2.** The government argues, alternatively, that the early closing order was a reasonable limitation on expressive conduct in a nonpublic forum. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983); *Duvallon v. District of Columbia,* 515 A.2d 724 (D.C.1986) (Supreme Court plaza is nonpublic forum). But even in the case of a nonpublic forum, the government must demonstrate that the limitation was reasonable and not designed to suppress expression. Because we find that the government cannot meet this burden with respect to the limitation imposed in this case, we need not deal further with the question of

whether the Capitol Rotunda is a non-public, as opposed to public, forum for First Amendment purposes.

**3.** *See Board of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed. 2d 500 (1987) (city resolution creating First Amendment free zone in airport's central terminal area unconstitutionally overbroad); *United States v. Nicholson, supra,* 184 U.S.App.D.C. at 306, 566 F.2d at 198 (order to leave valid only if based on something other than and additional to the unlawful entry statute itself or the status of the Chief of the Capitol Police).

corridors for the public and the public servants in order that the latter might carry out their Constitutional duties and in order that the former might observe their government in action, and so that they too might be able to petition for redress of grievances." Although the factual predicate for the arrests in the instant case differed greatly from that in *Arshack*,[4] a restriction on demonstrations in the Capitol Rotunda may be narrow enough to be compatible with its dual purposes of legislation and tourism. This court has made it clear, however, that such a restriction may not interfere with First Amendment expression to the same extent as would be permitted for the protection of the security of the President and his family in their private residence. Thus, in *(Marcy) Smith, supra*, the court upheld the unlawful entry convictions of four women who lay down on a patio inside the tourist line near the East Gate of the White House and began to speak about nuclear weapons, after they refused to heed repeated requests to leave. 445 A.2d at 963. The court considered reasonable "the stringent restriction" prohibiting any form of demonstration on the White House grounds and limiting the public's access to the White House to a tour of a portion of the Executive Mansion, precisely because of the unique nature of the White House grounds. *Id.* at 965–66. In almost any other public setting, the court stated, the extent of the restrictions would have placed too great a burden on the exercise of constitutional rights. *Id.* at 965.

■ Congress has an indisputably legitimate interest in regulating the Capitol building to ensure the safety of legislators, employees, and visitors. Although Congress was not in session on March 28, 1986, a strong governmental interest remained in

ensuring the security of the tourists who were present in the Rotunda and of any other persons who might walk through it and in ensuring that the Congressional activities that continue when that body is not in session could continue without interruption. This is especially true since the Capitol Police had been advised that the demonstrators intended to be arrested. As noted in *Shiel, supra*, the Sergeants at Arms of the Senate and House of Representatives have promulgated a regulation to support this interest, and, in the circumstances presented there to the Capitol Police, the "mere possibility that the demonstrators might have left the Rotunda voluntarily by 4:30 p.m. did not remove the threat of trouble at the time [the Chief of the Capitol Police and the Sergeants at Arms] acted." 515 A.2d at 407–08. Here, however, there was no special event planned in the Rotunda for that day, as there had been in *Shiel*. Nor was there any evidence that the presence of appellants and the group with which they associated disrupted either the legislating or tourism activities of the Capitol Rotunda. Consequently, it is significant that the Capitol Police never offered the group an alternative to leaving the center of the Rotunda or notified them that they were violating regulations which prohibited sitting down or obstructing passageways and asked them to desist in that violation. Instead, the Capitol Police immediately closed the Rotunda and used that as the basis for making arrests for unlawful entry.

■ The government maintains, however, that the early closing order was a reasonable restriction on appellants' First Amendment expression because their violation of the law prohibiting sitting, obstructing passageways, and demonstrating in the

---

4. In *Arshack* the defendants were allowed to petition their legislator on the east front of the Capitol leading to the Senate and thereafter were escorted by a Senator to the corridor outside the Senate. When they refused to stand in a roped-off area set aside for them to express their views and allow free passage into the Senate chamber, they were still permitted to present their petition and to read statements.

Only when about 120 persons lay down on the floor and were blocking the corridors did the Capitol Police advise the demonstrators that they were violating a statute and that if they did not remove themselves from blocking the corridors they would be arrested for violating the statute. When they refused to move, Capitol Police cordoned off the area and orderly arrests followed. 321 A.2d at 846–47.

Capitol created a security problem.[5] The language of the regulations makes clear, however, that there can be no violation of the unlawful entry statute until a person has refused to conform his or her activity to that required by the regulations. Thus, the language of § 809 of General Order 303.1 prohibiting sitting, lying or crouching down and other conduct disruptive of peace and good order provides that:

> If any individual engages in any conduct prohibited by this section, when ordered by any officer or member of the United States Capitol Police to cease and desist in such conduct, refuses or fails to do so, such individual shall immediately leave the Capitol. The refusal or failure ... to immediately leave the Capitol after being ordered to do so by any such officer or member of the Capitol Police shall constitute an unlawful remaining in the Capitol subject to the criminal penalty provision in [D.C.Code § 22–3102 for unlawful entry].

§ 809(b), *supra* note 5. Furthermore, the regulations prohibit only congregation "in a manner so as to ... *unreasonably* interfere with the passing or movement of any other individual ...," and actions causing a disturbance *"unreasonably* interfering with the preservation of peace and good order." § 809(a), *supra* note 5 (emphasis added). The evidence here, that tourists would have to detour around a group standing in the center of the Rotunda, is likely not only to be a fairly common occurrence when tourists are in the Rotunda but cannot be deemed to have unreasonably interfered with such traffic or the orderliness and peacefulness of activity in the Rotunda. Tourists and others passing through the Rotunda do not always stay where they are supposed to in any event, and no evidence was offered that any member of appellants' group was disorderly, violent, causing a disturbance or threatening anyone in the Rotunda. As to the general prohibition against demonstrating,[6] the seminal case in this area explains why appellants' conduct cannot constitute the basis for penalizing the exercise of their constitutional rights unless it interfered with the rights of others to a greater degree than tourists do. *Nicholson, supra,* 184 U.S.App.D.C. at 309–10, 566 F.2d at 201–02 (tourist standard used in exercise of court's duty to construe statutes to avoid unconstitutionality).

Nor does the government's reliance on *Shiel* save the early closing order since the evidence did not show that a less stringent restriction on the exercise of First Amendment rights would not have achieved the same security goals as effectively. In *Shiel, supra,* 515 A.2d 405, the United States Capitol Police had closed the Rotunda at 2:00 p.m., two and a half hours early, in order to conduct a security sweep of the area preparatory to the President's State of the Union Address to Congress that evening. A regulation promulgated by the Sergeants at Arms of the Senate and House of Representatives authorized the early closing to protect the security or safety of the President, Vice President, Members of Congress, or any other person. Several hundred demonstrators had converged in the Rotunda around 1:25 p.m., and sat on the floor chanting, singing and praying aloud. *Id.* at 407. Following announcements that the building was closed, and at least one reading of the unlawful entry statute, 158 demonstrators who chose to remain in the Rotunda were arrested. In upholding the unlawful entry convictions, the court quoted *United States v. Albertini,* 472 U.S. 675, 105 S.Ct. 2897,

---

5. D.C.Code § 9–112(b)(5) (1981) prohibits any person or group willfully and knowingly "to obstruct or to impede passage through or within the United States Capitol Grounds or any of the Capitol Buildings." D.C.Code § 9–112(b)(7) prohibits any person or group from "parad[ing], demonstrat[ing] or picket[ing] within any of the Capitol Buildings." USCP Gen.Order 303.1, § 809(a) (1979) prohibits sitting, lying, crouching down, congregating so as to interfere with passageways, and acting in a manner to cause a disturbance with peace and good order. Appellants have not challenged the constitutionality of the Capitol Police regulations.

6. 40 U.S.C. § 193f (1986); D.C.Code § 9–112. For purposes of this opinion, we will assume that appellants were demonstrating since it is unnecessary, in view of our disposition, to address their contrary contention. *See Kroll, supra,* 590 F.Supp. at 1290–91.

86 L.Ed.2d 536 (1985), for the proposition that "an incidental burden on speech [that] is no greater than is *essential,* and therefore is permissible ... so long as the neutral regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation." *Id.* (emphasis added). The court concluded that the government met its burden of showing the need for the early closing through testimony that the additional time for the security sweep of the Capitol was required to avoid diverting Metropolitan Police Department officers from their regular duties and that processing the demonstrators elsewhere would have been a less effective way of preserving evidence of the violations of law. *Id.* at 408.

The situation is fundamentally different here. Lt. Wooden testified that the only reason for closing the Capitol Rotunda area was to arrest the demonstrators. Several tourists were present in the Rotunda at the time, and according to him, "anytime we have a large group of demonstrators and there is an intent that they choose to be arrested, then we have a security issue, because of the number of people, tourists and so forth in the building." But he also acknowledged at one point, on cross-examination, that had a group of tourists done what appellants' group did, he would have told them to stand up and move on, and would not have closed the Rotunda.[7]

Finally, the government argues that "[i]t would have been irresponsible to have attempted to deal with a group of fifty demonstrators, all of whom might ultimately have been arrested, without first clearing the Rotunda and securing the area." *Cf. (Marcy) Smith, supra,* 445 A.2d at 965 (Secret Service need not "wait until a demonstration at the White House becomes violent or boisterous before steps are taken to curb it"). But this assumes what proved to be untrue, namely, that all of the demonstrators would refuse to obey requests to conform their behavior to the regulations. From the advance information that the Capitol Police received of the demonstrators' intention to be arrested, it does not inevitably follow that their conduct would be incompatible with maintaining the security of persons in the Rotunda. *See Dellums v. Powell, supra,* 184 U.S.App.D.C. at 288, 556 F.2d at 180. Anticipatory security concerns of the kind present do not provide the premise for curtailment of First Amendment rights. *See Edwards v. South Carolina,* 372 U.S. 229, 236, 83 S.Ct. 680, 684, 9 L.Ed.2d 697 (1963); *cf. Cohen v. California,* 403 U.S. 15, 20–21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971). Absent a showing that appellants had failed to conform their behavior to the regulations, the Capitol Police lacked a basis for concluding that security was threatened because arrests would be required because appellants would fail to comply with the unlawful entry statute.

█ Here the closure order was tailor-made for the demonstrators and it served as the basis for their arrests. Closing the area for security reasons arising from the presence of the demonstrators cannot serve to bootstrap the security concern into an independent factor justifying their arrest. Unlike the circumstances in *Shiel,* the security claim for closing the Rotunda was pretextual and the closing could not, in turn, serve as the basis for security concerns.[8] As noted by the trial judge in another Rotunda arrest case:

> A policy which results in the closing of the Rotunda when people exercise rights protected by the First Amendment, but in the Rotunda remaining open when such rights are not being exercised, penalizes and chills constitutionally protected activity.... To close the Rotunda, thus precluding the defendants from protesting and members of the public from viewing national treasures, was surely

---

**7.** On redirect, Wooden backtracked, saying that he would have treated the tourists in exactly the same way as the group of fifty demonstrators, immediately closing the Rotunda before asking them to conform their conduct to the law and regulations.

**8.** Other cases on which the government relies are factually distinguishable. *E.g., Albertini, supra,* 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (military base); *Edwards v. South Carolina,* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (state house grounds).

incompatible with the First Amendment where, as here, lesser measures, such as directing the protestors to stand, were never attempted.

*United States v. Murphy,* 114 Daily Wash. L.Rptr. 2149, 2158 (October 20, 1986) (citations omitted).

Accordingly, we hold that appellants' arrests were unlawful because the early closing order was precisely the kind of *ad hoc* exercise of unbridled discretion that is constitutionally prohibited, and, therefore, the judgments of conviction must be reversed.[9]

9. In view of our disposition we do not reach appellants' other contentions that the evidence was insufficient to sustain their convictions since the government's proof did not isolate their conduct from that of the larger group. Nor, for the same reason, do we reach appellant Wheelock's contention that the trial court erred in instructing the jury on unlawful entry and in failing, *sua sponte,* to give a special unanimity instruction.