Stacey ABNEY, Appellant,

v.

UNITED STATES, Appellee.

Nos. 91–CM–642, 91–CM–654.

District of Columbia Court of Appeals.

Argued Oct. 13, 1992.
Decided Nov. 20, 1992.

A. Patricia Frohman, Washington, D.C., appointed by the court, for appellant.

Robert J. Meyer, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Thomas C. Black, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN, SCHWELB and WAGNER, Associate Judges.

1. D.C.Code § 22–3102 (1989).

2. The Capitol Police Board issued the order pursuant to its authority under 40 U.S.C. § 212a (1988) (originally enacted as Act of July 31,

WAGNER, Associate Judge:

Appellant, Stacey Abney, challenges the constitutional validity of Capitol Police Board Order 91.1 (January 18, 1991) upon which his conviction of two counts of unlawful entry are based.[1] He also contends that the trial court erred in failing to instruct the jury on his defense of a *"bona fide* belief" in his "right to remain" on the area of the Capitol grounds where he was arrested. We affirm.

I.

The evidence showed that appellant had been conducting a demonstration at the U.S. Capitol grounds for many years to protest the denial of veterans' benefits for diseases which he claims he contracted during service in World War II. *See Abney v. United States,* 451 A.2d 78 (D.C.1982) (*Abney II*); *United States v. Abney,* 175 U.S.App.D.C. 247, 534 F.2d 984 (1976) (*Abney I*). As a part of his continued protest, appellant virtually lived under the steps of the Capitol. According to the evidence, he usually demonstrated for about six hours a day on the Capitol steps before retreating to an area under the steps (the carriage way) to sleep. The police authorities usually tolerated appellant's presence except when tightened security measures were placed in effect for special occasions (*e.g.,* Presidential State of the Union addresses, visits from heads of states, or Inaugural events).

On January 18, 1991, the Capitol Police Board issued Order 91.1 closing all steps and the areas adjacent to the U.S. Capitol except for certain specified areas.[2] The order was issued to address increased security concerns created by the Persian Gulf crisis and potential threats of terrorist activities as a result of it. The order specified that its objectives were to insure the safety of government officials and visitors by maintaining unobstructed passageways for rapid evacuation in case of fire or explosion and to protect persons and property

1946, ch. 707, § 9, 60 Stat. 719). Appellant does not challenge the Police Board's authority to promulgate the regulation.

by preventing anyone from placing a bomb or other dangerous device in the area. The order also provided for the police to make safe and reasonable arrangements for cordoning off "a limited area on the East Front center steps to accommodate larger groups of visitors to the Capitol for the sole purpose of controlled and continuous access which is to be at all times strictly monitored by the Capitol Police...." The order allowed the police to create a comfortable perimeter around the building so that police could provide better security for the Capitol, its visitors and workers in the event of bomb explosions or attack. The Chief Deputy of the Uniform Services Bureau, Robert Langley, transmitted the order to the commanding officer of the Capitol Division for implementation on January 18, 1991. A cover memorandum stated: "You are reminded that Mr. Abney is in violation of the provisions of this order and should he refuse to quit the area, he is to be arrested immediately."[3] Mr. Abney was well known to the Capitol Police at the time because of his protest activities.

There were two other demonstrations in the area of the east front Capitol Rotunda steps during this period, one by the Community for Creative Non–Violence (CCNV) and the other by the Native American Indian Support Group. There were about five individuals conducting a 24–hour a day protest with the CCNV group. About seven persons were protesting during the daytime with the Native American Indian Support Group. Both groups were directed to the grassy area away from the east front steps, and they complied. Other groups had their permits cancelled. Although appellant was arrested on January 19th and 20th,[4] he returned to the restricted area on January 21st where he was arrested at 2:00 p.m. in an area adjacent to the Rotunda steps. Officer Thomas Wissemann explained the new regulation to appellant, asked him three or four times to leave the area, and directed him to an alternative location on the east front grassy area where he could continue his demonstration. Appellant responded that he was demonstrating and refused to leave, and the police arrested him. The next day appellant was arrested again underneath the steps of the Rotunda by Sergeant Thomas Reynolds and Officer Bruce Atchinson. Sgt. Reynolds asked appellant to leave the area five times and directed him to the east front grassy area where it was lawful to demonstrate. Again, appellant said that he was demonstrating, and he refused to leave.

Appellant testified in his own behalf at trial that at the times of his arrests, he was protesting the government's refusal to award him veterans' benefits to which he was entitled as a result of diseases he suffered during his army service. Appellant said he did not want to move to the designated area because no one would see him there. He also testified that he was not blocking any entrance when arrested. Appellant stated that he thought he could demonstrate in the restricted area because he believed the courts would uphold his First Amendment rights to protest as they had on other occasions.

## II.

Under D.C.Code § 22–3102 (1989) a person who enters on public or private property without lawful authority or who refuses to leave on demand of one lawfully in charge of that property may be convicted of unlawful entry.[5] This court has held

---

**3.** We reject at the outset any notion that the order discriminated against appellant because of the contents of the cover memo. As the testimony clearly showed, the police sought to apply the order to everyone, without exception and to avoid discriminating in appellant's favor.

**4.** The charges connected with appellant's arrests on these dates were not prosecuted.

**5.** D.C.Code § 22–3102 (1989) provides in pertinent part:

> Any person who, without lawful authority, shall enter, or attempt to enter, any public or private dwelling, building or other property, or part of such dwelling, building or other property, against the will of the lawful occupant or of the person lawfully in charge thereof, or being therein or thereon, without lawful authority to remain therein or thereon shall refuse to quit the same on the demand of the lawful occupant, or of the person lawfully in charge thereof, shall be deemed guilty of a misdemeanor....

that when public property is involved, in order "[t]o protect the unlawful entry statute from unconstitutional vagueness and to protect First Amendment rights, ... the government must prove not only that a person lawfully in charge of public premises has ordered the defendant to leave but that there is 'some additional specific factor establishing the party's lack of a legal right to remain.'" *Wheelock v. United States,* 552 A.2d 503, 505 (D.C.1988) (footnote omitted) (quoting *O'Brien v. United States,* 444 A.2d 946, 948 (D.C.1982)); *see also Hemmati v. United States,* 564 A.2d 739, 741 (D.C.1989).[6] The independent factor establishing the prohibition against remaining in the area where appellant was arrested is Capitol Police Board Order 91.-1.[7] Appellant challenges the constitutional validity of the order as written and as applied. Specifically, appellant argues that the order: (1) served no "compelling state interest" and was not the least restrictive means of assuring the security of the Capitol during the Gulf War crisis; (2) failed to provide alternative means for appellant's protest; and (3) should have applied only when an actual or imminent threat to the security of the area arose. We reject each of these arguments.

Appellant concedes that the order is a reasonable means of achieving the legitimate governmental interest of providing enhanced security at the Capitol during the Gulf War insofar as group demonstrations such as that of CCNV or the Native American Indian Support Group are concerned. However, he contends that it was unnecessary to include among those restricted from the area a known, lone demonstrator. Appellant premises this argument on the requirement that any governmental restriction on the use of a public forum, such as the Capitol,[8] must be narrowly drawn to

serve a significant state interest. *See Cornelius v. NAACP Legal Defense and Educ. Fund,* 473 U.S. 788, 800, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985); *see also Perry Educ. Ass'n v. Perry Local Educ. Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). Moreover, he argues, any curtailment on free expression in a public forum must be "no greater than is essential to the furtherance of [a substantial government] interest." *See United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). In any event, appellant contends that the police order is unconstitutional as applied to him because there was no evidence that he posed an actual threat to the security or evacuation of the Capitol by his lone demonstration.

■ Essentially, appellant argues that the regulation should have contained a provision exempting individual protestors like him. Reasonable time, place and manner restrictions on expressive conduct need not be so narrowly drawn to pass constitutional muster. The validity of a government regulation, unrelated to the suppression of speech, concededly designed to achieve a substantial governmental interest, is not dependent upon whether the decision-maker could have developed an alternative measure imposing the restriction on fewer individuals. *See Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 299, 104 S.Ct. 3065, 3072, 82 L.Ed.2d 221 (1984); *see also Ward v. Rock Against Racism,* 491 U.S. 781, 798, 109 S.Ct. 2746, 2757, 105 L.Ed.2d 661 (1989). On the contrary, "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-

---

6. The government assumes for purposes of argument that the First Amendment was implicated by the facts in this case. We conclude that the order in question and appellant's activities at the Capitol in fact implicate the First Amendment and require scrutiny thereunder. *See Abney I* and *Abney II, supra.*

7. The order expired in March 1991, after the Gulf War ended.

8. The United States Capitol is recognized as a " 'unique situs for demonstration activity' and is a place traditionally open to the public ... to which access cannot be denied broadly or absolutely...." *Wheelock, supra,* 552 A.2d at 506 (quoting *Kroll v. United States,* 590 F.Supp. 1282, 1289–90 (D.D.C.1983)).

speech-restrictive alternative." *Ward,* 491 U.S. at 800, 109 S.Ct. at 2758. The idea that courts should engage in second-guessing the responsible authorities about how a legitimate governmental interest might have been achieved better has been rejected explicitly by the Supreme Court. *Clark,* 468 U.S. at 299, 104 S.Ct. at 3072. The point is well summarized in the following excerpt from the Court's decision:[9]

> [w]e are unmoved by the Court of Appeals' view that the challenged regulation is unnecessary, and hence invalid, because there are less speech-restrictive alternatives that could have satisfied the Government interest in preserving park lands. There is no gainsaying that preventing overnight sleeping will avoid a measure of actual or threatened damage to Lafayette Park and the Mall. The Court of Appeals' suggestions that the Park Service minimize the possible injury by reducing the size, duration, or frequency of demonstrations would still curtail the total allowable expression in which demonstrators could engage, whether by sleeping or otherwise, and these suggestions represent no more than a disagreement with the Park Service over how much protection the core parks require or how an acceptable level of preservation is to be attained. We do not believe, however, that either *United States v. O'Brien* or the time, place, or manner decisions assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained.

*Clark,* 468 U.S. at 299, 104 S.Ct. at 3072 (footnote omitted).

■ In this case, there was likewise a legitimate government interest in protecting the Capitol, government officials, and others who work and visit there from potential bomb threats during a unique period of crisis, and it is apparent that the area would have been exposed to greater danger without the regulation than with it. We are satisfied in this case that the means chosen by the police to secure the government's legitimate interest are not substantially broader than necessary. *Ward, supra,* 491 U.S. at 800, 109 S.Ct. at 2758. Such a regulation is not invalid under the First Amendment. *See Clark, supra,* 468 U.S. at 297, 104 S.Ct. at 3071. Moreover, we are not in a superior position to the Capitol Police " ... to judge how much protection of [the Capitol grounds] is wise and how that level of [protection] is to be attained." *See id.* at 299, 104 S.Ct. at 3072. We cannot substitute our judgment for that of the Capitol Police, the responsible body, which determined that restrictions on all, instead of just some, individuals were required to protect the perimeters of the Capitol under the circumstances. *See id.*

■ Appellant also argues that since he posed no actual threat when arrested, the regulation is unconstitutional as applied. The Supreme Court rejected a similar argument that a speech-restrictive regulation may be constitutionally tested by reference to the effect of the particular demonstration on the state interest sought to be protected. *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 652–53, 101 S.Ct. 2559, 2566–67, 69 L.Ed.2d 298 (1981). Before the court for consideration was the constitutionality of a regulation prohibiting the sale or distribution of merchandise at the state fairgrounds except from a duly-licensed location. *Id.* at 643–44, 101 S.Ct. at 2561–62. The Minnesota Supreme Court held "that the case did not turn on the 'importance of the State's undeniable interest in preventing the widespread disorder that would surely exist if no regulation ... were in effect' but upon the significance of the State's interest in avoiding whatever disorder would likely result from granting members of [the society] an exemption from the Rule." *Id.* at 651–52, 101 S.Ct. at 2565–66. The Supreme Court found that this approach, which focused on the impact of the

---

9. In *Clark,* the Supreme Court rejected a First Amendment challenge to a National Park Service regulation prohibiting camping in Lafayette Park and on the Mall where demonstrators sought to call attention to the plight of the homeless by camping on the sites.

demonstration at hand, was too narrow and that the relevant inquiry must include the potential impact on the state interest of application of an exemption to others who would be entitled to it. *Id.* at 654, 101 S.Ct. at 2567. When the case before this court is viewed in this way, the government's interest in restricting the access of all individuals to a specific perimeter during the Gulf War crisis in order to monitor and control potential threats to the security of the building and its users becomes apparent. *See id.* The consequences of an exemption or the non-enforcement of the order as to single individuals would defeat the purpose of protecting the governmental interest. *Id.*

■■■ Appellant relies upon this court's decision in *Abney II* to support his argument that the order is unconstitutional as applied to him and overbroad because not the least intrusive means to accomplish the state's legitimate ends. In *Abney II,* this court held a traffic regulation for the Capitol grounds unconstitutional as applied because the government failed to establish that "[appellant's] presence had actually or potentially threatened the movement of traffic on the [Capitol] grounds, [thus] the application of the [regulations] . . . to him, constituted a greater restriction of his First Amendment freedom than was necessary to further the government's legitimate interests." *Abney II, supra,* 451 A.2d at 83–84. The holding in *Abney II* is based upon an interpretation of the fourth prong of a test for constitutionality set forth in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). In *O'Brien,* the Supreme Court stated:

> [W]e think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 377, 88 S.Ct. at 1679. Since *O'Brien* and *Abney II* were decided, the Supreme Court has made clear that the *O'Brien* test " 'is little, if any, different from the standard applied to time, place and or manner restrictions.' " *Ward, supra,* 491 U.S. at 798, 109 S.Ct. at 2757 (quoting *Clark, supra,* 468 U.S. at 294, 104 S.Ct. at 3069). The court specifically rejected the notion that the regulation of time, place and manner of protected speech must be the least restrictive or least intrusive means of meeting the government's legitimate interests. *Ward,* 491 U.S. at 798, 109 S.Ct. at 2757. The court elaborated as follows:

> So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. "The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests" or the degree to which those interests should be promoted.

*Id.* at 800, 109 S.Ct. at 2758 (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985)). Any reading of *Abney II* for the contrary proposition must give way to the decisions in *Ward, Clark* and *Albertini.* A division of this court is empowered to give effect to constitutional rulings which render earlier decisions of this court of no further force. *Kleinbart v. United States,* 604 A.2d 861, 870 (D.C.1992) (citing *Frendak v. United States,* 408 A.2d 364, 379 n. 27 (D.C.1979)). Thus, the proper focus is not on whether a less restrictive alternative could be devised, but whether the order in question promotes a substantial government interest, and the city is not required to await actual harm before enforcing a regulation such as Order 91.1.

■■■ Even appellant does not dispute the city's undeniable interest in promulgating an order to provide greater security for the

U.S. Capitol and those using it during a war-time crisis. It is also plain that the order was designed to promote that substantial governmental interest. Accordingly, based on the preceding analysis, we reject appellant's argument that the order was unconstitutional either facially or as applied.

■ Appellant also challenges the constitutionality of the regulation on the ground that the order did not provide alternative channels for communication. *See Ward, supra,* 491 U.S. at 802, 109 S.Ct. at 2759. On the contrary, the order restricted access only to certain specified areas.[10] Other areas remained available for any demonstrations. The evidence showed that there were four areas on the east front of the Capitol where appellant could carry on his protest. In addition, the other side of the Capitol building on the west front grassy area located on the building's north side, was available. Indeed, appellant's "demonstrations" under the Rotunda steps, where there were few people passing and limited traffic, belie his claim that the grassy areas around the Capitol's east front were not sufficient for carrying out the demonstrations. Other groups were directed to the area and complied. By locating himself near those other groups, it appears that appellant would have been afforded a greater opportunity for exposure. These may not have been the most ideal areas from which to protest, but given the government's substantial interest in monitoring for dangerous activities and in keeping

evacuation routes clear, the order was a reasonable time, place or manner regulation of appellant's rights under the First Amendment. *See Perry Educ. Ass'n, supra,* 460 U.S. at 45, 103 S.Ct. at 954. For the foregoing reasons, we find unpersuasive appellant's claim that Order 91.1 was constitutionally infirm facially or as applied.

### III.

■ Appellant's final argument for reversal is that the trial court erred in denying his request for a jury instruction on a defense of a *bona fide* belief in his right to remain in the restricted area. "While a *bona fide* belief in one's authority to enter or remain upon premises may negate criminal intent, and thereby exonerate behavior which otherwise contravenes the unlawful entry statute, there must be sufficient evidence that the belief had a reasonable basis before the issue properly may be submitted to the jury." *Leiss v. United States,* 364 A.2d 803, 809 (D.C.1976) (citations omitted), *cert. denied,* 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977); *accord Gaetano v. United States,* 406 A.2d 1291, 1293 (D.C. 1979). Appellant argues that because the courts had reversed some of his convictions when he was arrested before, he had a good faith belief in his authority to remain near or under the Capitol steps where he was arrested. His good faith belief, however, depends on a court upholding that right based on the individual facts of the

---

**10.** Pertinent provisions of the order read as follows:

(b) We, the Members of the Capitol Police Board, pursuant to our authority under the provisions of Section 9 of the Act of July 31, 1946 (40 U.S. 212a), to direct the policing of the United States Capitol Building and Grounds hereby order and direct the United States Capitol Police to take such action as necessary to close all steps adjacent to the Capitol, as defined in subsection (c) of this section, to all activities heretofore scheduled or unscheduled.

(c) For the purposes of this order, the term "step" shall include landings, porches, cheekblocks and balustrades (adjacent to or associated with such steps) and the sidewalks in front of any such steps and situated between such steps and the curbline and all areas

including the grassy areas between the East Front Senate steps and the East Front center steps and between the East Front House steps and the East Front steps.

* * * * * *

(e) Provided, however, that (1) the Capitol Police shall make such arrangements as are safe and reasonable to cordon off a limited area on the East Front center steps to accommodate large groups of visitors to the Capitol for the sole purpose of controlled and continuous access, which is to be at all times strictly monitored by the Capitol Police (2) all other such use of the areas defined in subsection (c) of this section shall be limited solely to the continuous access or egress of the Capitol Building, and (3) any sitting, lying or other loitering in such areas shall be prohibited.

case. Thus, the authority on which appellant relies was a possible favorable ruling on the legality of his actions by a court. The reasonable good faith belief defense applies where such "beliefs [are] based on a reasonable mistake of fact or of non-penal law." *Morgan v. District of Columbia,* 476 A.2d 1128, 1133 (D.C.1984). "The '*bona fide* belief' defense was not meant to excuse intended acts based on an erroneous belief they are legally defensible under penal laws...." *Id.* Here, appellant relies upon a mistaken belief in a constitutional law defense. Such mistake of law will not support a *bona fide* defense theory. *Shiel v. United States,* 515 A.2d 405, 409 (D.C. 1986), *cert. denied,* 485 U.S. 1010, 108 S.Ct. 1477, 99 L.Ed.2d 706 (1988). Therefore, we find no error in the trial court's ruling.

*Affirmed.*