**Amy L. MARKOWITZ, Appellant,**

**Peter Caplan, Appellant,**

**Jane Zara, Appellant,**

**Paul E. Ruther, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**Nos. 88–763, 88–764, 88–865 and 88–866.**

District of Columbia Court of Appeals.

Argued Dec. 6, 1990.

Decided Oct. 15, 1991.

---

Mark L. Goldstone, for appellants.

R. Craig Lawrence, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher and John D. Bates, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, PRYOR and BELSON,* Senior Judges.

BELSON, Senior Judge:

Each of the four appellants was charged with a single count of demonstrating in the United States Capitol building in violation of D.C.Code § 9–112(b)(7) (1981).[1] Following a bench trial, the trial judge found all appellants guilty and sentenced them to five days imprisonment with execution of the sentence suspended. The trial judge then placed appellants on six months probation and ordered each to perform twenty-five hours of community service. On appeal, appellants contend that unless a requirement of a showing of disruption of the activities of Congress is read into section 9–112(b)(7), it should be declared unconsti-

---

* Judge Belson was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on July 24, 1991.

1. D.C.Code § 9–112(b)(7) (1981) provides that "[i]t shall be unlawful for any person or group of persons willfully and knowingly ... [t]o parade, demonstrate, or picket within any of the Capitol Buildings."

tutional on its face. Appellants also contend that their conduct was no more disruptive than that of an ordinary tourist or visitor to the Capitol building, and therefore their convictions must be reversed. We affirm.

## I.

Following a pretrial evidentiary hearing, the trial judge denied appellants' motion to dismiss on the ground that the prosecutor's refusal to admit appellants into a diversion program unconstitutionally chilled their First Amendment rights and deprived them of equal protection of the law guaranteed by the Due Process Clause of the Fifth Amendment. Appellants do not challenge that ruling on appeal. The judge prefaced his ruling on the motion with an extensive written statement of facts that served as the findings of fact on which he based his ruling. We set forth those findings here:

> The testimony of all the witnesses was consistent for the most part. On December 18, 1987, the defendants along with approximately 10 to 15 other persons went to the Capitol Building to present a message or statement to Speaker of the House, Jim Wright, regarding aid to the Contra rebels in Nicaragua. They were escorted to the second floor of the Capitol Building by a page. When they got to the corridor area leading to the Democrat's door to the floor of the House of Representatives, which was then in session, a member of the U.S. Capitol Police force stopped them and asked them where they were going. According to Officer William Hynes the corridor in which they were stopped was then considered a "secure area" or a "restricted area" and was not then open to the general public. They said they wished to see Speaker Wright, whose office was about 30 feet down the corridor, but that they did not have an appointment. Officer Hynes called his detail office and requested that an official be sent up. The detail office called Sergeant Proctor and Sergeant Charles C. Johnson, who in turn called Officer William Turner.

> Shortly before 11:50 a.m. these three officers arrived at the second floor area where the defendants were located. At about the same time Officer Wells, who was in an adjacent stairwell, heard a commotion and also arrived on the scene. At that time the defendants were talking to some of the officers who agreed that one of the officers would escort Mr. Ruther to Speaker Wright's office to deliver the written message the group had brought. When Mr. Ruther returned, he and the other defendants conferred for a few seconds. It was then that Mr. Caplan began to pull out of his jacket pocket a banner. Ms. Zara took one end of the banner and they began to unfurl it. None of the witnesses testified that it was unfurled completely. Mr. Ruther said he could see enough of the lettering to see that the banner was upside down. Within a few seconds one of the officers grabbed the banner. Then all of the defendants sat down cross-legged in a circle in the corridor and began chanting loudly and clearly "No Contra Aid." Almost simultaneously the officers commenced grabbing the defendants, seizing them, and removing them from the area. The witnesses all agreed that only about a minute elapsed between the time Mr. Caplan and Ms. Zara began to take out the banner and the time the officers began seizing them.

*United States v. Ruther,* 116 Daily Wash. L.Rptr. 917, (D.C.Super.Ct. Mar. 17, 1988) (footnotes omitted).

The foregoing functioned as the findings of fact on which the motion was decided, and we treat them as such. We also note that the record of the motions hearing was incorporated by agreement into the record of trial. Thus the record facts on which the findings were based were before the judge when he ruled on the merits and found appellants guilty.

At trial, much of the evidence was uncontested. The officers testified consistently with one another that at the time of the incident the corridor appellants were in was

a restricted area of the Capitol building.[2] Generally, a building access card is needed to enter this corridor when it is restricted and thus not open to the public. Officer Hynes stated that at the time of appellants' conduct, a vote was taking place on the floor of the House of Representatives. Pursuant to regulations, when a vote is occurring, certain hallways and corridors are to be kept clear of all persons to allow free passage by House members. A bell and lighting system is used in the Capitol building to signal when a vote is in progress. Because visitors or tourists may be unfamiliar with this procedure, all persons who come into the area while it is restricted are approached by officers, told it is a secure area, and asked their purpose for being there.

The officers were also consistent in testifying that appellants were approximately five to ten feet from the Democratic door leading to the floor of the House of Representatives. The doorman at the door to the floor of the House of Representatives complained to the officers present that appellants' chanting was loud and disturbing, and could be heard on the House floor. Appellants chanted "NO CONTRA AID" about twelve times. According to Officer Hynes, House members were attempting to gain access to the Democratic door. When appellants began chanting, House members stopped in the hallway and "a crowd of members," approximately twelve, came off the House floor to see what was happening; a few members asked in an angry tone of voice what was going on.[3]

Appellants were charged with demonstrating in the Capitol building in violation of D.C.Code § 9–112(b)(7) (1989). Along with necessity and international law defenses, appellants asserted that section 9–112(b)(7) was unconstitutional under the First and Fourteenth Amendments. The trial judge declined to apply a narrowing construction to the statute to limit its application to disruptive demonstrations.

The parties did not request that the trial judge make specific findings of fact. Following the bench trial, the trial judge returned a general verdict of guilty.

All right. For the record, the Court has considered the matter, and the Court is of the view at this point that the facts and circumstances involved in this case [do] not justify the necessity defense or the International Law defense, and the Court finds that the evidence relevant to those matters [is] not sufficient at this point to exculpate or exonerate the defendants. And those defenses rejected, the Court finds that on the basis of the testimony and the evidence in the case at this point that the defendants are guilty as charged in the respective informations, and the Court so finds at this time.

Our review is subject to the limitations provided in D.C.Code § 17–305(a) (1989), which provides in pertinent part: "[w]hen the case was tried without a jury, the court may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or with-

2. Officer Wells testified at the motions hearing that "that area is a secure area, and you cannot get in to see—generally you cannot get in to see Speaker Wright without an appointment." He further testified that an individual would know that this particular area is a secure area because "a uniformed officer [is] there," and a sign posted there reads "[n]o unauthorized personnel beyond this point." Officer Johnson also stated that appellants were arrested in a restricted area. Officer Hynes' testimony at the motions hearing on this point was the only one that was somewhat rather garbled because he stated that the officers were "kind of keeping them from gaining passage to the restricted area," that appellants were in such an area, and that it was a "fine line." This testimony was before the trial judge when he made the findings concerning "restricted area" set out above.

3. While the trial judge's finding at the motion hearing, quoted above, suggests that the appellants had at least begun their chanting before being arrested and the testimony from both the officers and some of the defense witnesses would support such a finding, he did not rely on any such express or implied finding in determining guilt. Similarly, appellants did not contradict in their testimony the government's evidence of the disturbing impact of their behavior on the deliberations of the House of Representatives, but the trial judge did not rely on the evidence of disturbance in finding guilt, nor do we rely on it in affirming.

out evidence to support it." *See Robinson v. Jones,* 429 A.2d 1372, 1374 (D.C.1981).

## II.

Appellants contend that the statutory prohibition against demonstrating in the Capitol building is unconstitutional "unless a requirement of disruption of, or an interference with Congressional activities ... is read into the statute." Under their interpretation the statute would prohibit only conduct that disrupts the orderly functioning of Congress. Appellants further contend that because their conduct was not more demonstrative than conduct normally engaged in by tourists or visitors, their convictions must be reversed.

This court has recognized and adopted the Supreme Court's classification of types of government property for purposes of First Amendment analysis. *Pearson v. United States,* 581 A.2d 347, 349, 351–52 (D.C.1990), *cert. denied,* — U.S. —, 112 S.Ct. 51, 116 L.Ed.2d 28 (1991). The consideration of such classifications, commonly referred to as "forum analysis," is employed by the court to weigh the government's interest in limiting the use of its property against the competing interests of those who wish to use the property to conduct expressive activity. *Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 800, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985). Such analysis is appropriate because "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that *might be caused* by the speaker's activities." *Id.* at 799–800, 105 S.Ct. at 3447–3448 (emphasis added); *accord, United States v. Wall,* 521 A.2d 1140, 1143 (D.C.1987).

■■■ The first category, traditional public forums, includes property that has a "long tradition of devotion to assembly and debate." *Pearson, supra,* 581 A.2d at 351 (citing *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45,

103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983)). On such property, "the rights of the government to restrict expressive activity are very limited." *Id.* If a "government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized." *Carey v. Brown,* 447 U.S. 455, 461–62, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980). In a traditional public forum, content-based regulations may be enforced if they are narrowly drawn to serve a compelling state interest, and "[c]ontent-neutral restrictions on the time, place and manner of expression, are permissible if they are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication." *Wall, supra,* 521 A.2d at 1143.

■■■ The second category includes what are referred to as designated public forums, encompassing public property that is not a public forum by tradition but that the state has designated for public use usually for limited expressive activity. *Pearson, supra,* 581 A.2d at 351 (citing *Perry, supra,* 460 U.S. at 45, 103 S.Ct. at 954); *accord, Wall, supra,* 521 A.2d at 1143. Content-based regulations must meet the same criteria as apply to a traditional public forum, *i.e.,* the regulation must serve a compelling state interest and must be narrowly drawn to achieve that end. *Widmar v. Vincent,* 454 U.S. 263, 269–70, 102 S.Ct. 269, 274–75, 70 L.Ed.2d 440 (1981). If the restriction is content-neutral, the state may impose reasonable time, place, and manner restrictions. *Pearson, supra,* 581 A.2d at 351–52 (citing *Perry, supra,* 460 U.S. at 46, 103 S.Ct. at 955). In a designated public forum, the state is not required to retain the open character of the forum (property) indefinitely. *Wall, supra,* 521 A.2d at 1143.

■■■ The third category comprises "[p]ublic property which is not by tradition or designation a forum for public communication." *Perry, supra,* 460 U.S. at 46, 103

S.Ct. at 955; *accord, Wall, supra,* 521 A.2d at 1143. In such nonpublic forums, the government has the right, in addition to imposing reasonable time, place, and manner restrictions, to "reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry, supra,* 460 U.S. at 46, 103 S.Ct. at 955 (citing *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 131 n. 7, 101 S.Ct. 2676, 2686 n. 7, 69 L.Ed.2d 517 (1981)). Moreover, the state "has [the] power to preserve the property under its control for the use to which it is lawfully dedicated." *See id.* The Supreme Court has explicitly stated that

> property owned or controlled by the government which is *not* a public forum may be subject to a prohibition of speech, leafleting, picketing, or other forms of communication without running afoul of the First Amendment. Admittedly, the government must act reasonably in imposing such restriction, *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 130–31 [97 S.Ct. 2532, 2540, 53 L.Ed.2d 629] (1977), and the prohibition must be content-neutral.

*United States Postal Serv., supra,* 453 U.S. at 131 n. 7, 101 S.Ct. at 2686 n. 7 (citing *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); *Adderley v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966)). A regulation governing a nonpublic forum, therefore, is evaluated for content neutrality and reasonableness. *United States v. Kokinda,* — U.S. ——, 110 S.Ct. 3115, 3119–20, 111 L.Ed.2d 571 (1990).

■ To invoke the forum analysis, it must be shown first that the activity or conduct in question is protected by the First Amendment; thereafter, the nature of the forum must be identified. *Cornelius, supra,* 473 U.S. at 797, 105 S.Ct. at 3446. In this instance, it is clear that appellants engaged in speech-related conduct by unfurling the banner on which was written " 'the Contras are the problem, not the solution.' Nobel Peace Prize Laureate Oscar Arnulfo Arias," and by chanting "no Contra aid."

Addressing the nature of the location of the demonstration, the trial judge, in ruling on the pretrial motions, referred to the undisputed testimony that the area in question was a restricted corridor. As he stated, "[a]ccording to Officer William Hynes the corridor in which they were stopped was then considered [at that time] a 'secure area' or a 'restricted area' and was not then open to the general public." *Ruther, supra,* 116 Daily Wash.L.Rptr. at 917. The trial judge further stated that "[i]n *Nicholson,*[4] the defendants were gathered on the center steps of the East Front of the Capitol, *rather than inside the building in a restricted area,"* *id.* at 921 (emphasis added), plainly a reference to his earlier finding that appellants were in a restricted area.

■ The record supports the trial judge's factual finding that appellants were in a restricted corridor in the Capitol; indeed it was undisputed that the demonstration was conducted five to ten feet from the Democratic door of the House of Representatives and that the area was restricted because a vote of the House was in progress. Accordingly, the site of appellants' demonstration must properly be classified as a nonpublic forum.[5]

---

**4.** *See United States v. Nicholson,* 97 Daily Wash. L.Rptr. 1213 (D.C.Super.Ct. June 19, 1969) (appended to *Dellums v. Powell,* 184 U.S.App.D.C. 275, 305, 566 F.2d 167, 197 (1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978)), *aff'd,* 263 A.2d 56 (D.C.1970).

**5.** This particular corridor obviously cannot be classified as a traditional public forum. The corridor is not a designated public forum because it has not been so classified by the United States government. We do not understand appellants to argue otherwise.

Having concluded that this specific restricted area was a nonpublic forum, we do not deal with other areas of the Capitol buildings. We add that we do not suggest that only "restricted" areas of the Capitol buildings are "nonpublic forums." Those terms are not necessarily coextensive. We conclude only that at the time of the events in question, the locale where they occurred was a nonpublic forum.

We next must evaluate section 9–112(b)(7) to determine whether it is (1) content neutral and (2) reasonable. The term "content neutral" has been used to describe restrictions on speech that "are justified without reference to the content of the regulated speech." *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976). A statute whose purpose is unrelated to the content of expression is neutral "even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989).

D.C.Code § 9–112(b)(7) provides that "[i]t shall be unlawful for any person or group of persons willfully and knowingly ... [t]o parade, demonstrate, or picket within any of the Capitol Buildings." Its express terms clearly indicate that Congress intended an absolute ban on all types of demonstrations in the Capitol buildings. The means Congress employed to serve its interest, a flat ban on all demonstrations in the Capitol buildings, is content neutral.

The next question to address is whether the statute is reasonable. In *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Supreme Court stated that:

Whatever imprecision inheres in [the statute's] terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377, 88 S.Ct. at 1679.

It is a known fact that the peculiar and historical nature of the Capitol building attracts many tourists each year. At the same time that the Capitol building is a historic landmark, however, it is also the place where members of Congress carry out the duties of office. The ability of members of Congress to function efficiently in light of the nature of their work is a legitimate and identifiable goal; among other things, they must have free passage to attend hearings and meetings, unobstructed access to the floor of the House of which they are members, and an undisturbed setting in which to deliberate and cast votes upon proposed legislation. The legislative history confirms the governmental interest Congress sought to serve, *viz.*, to transact its business in an orderly manner without interference while respecting the right of the people to assemble peaceably and to petition the government.[6]

---

6. Mr. David C. Bress, United States Attorney, testified before the Senate subcommittee hearing on September 21, 1967, and before the House hearings on September 28, 1967, concerning the legislation that included section 9–112(b)(7). At both hearings Mr. Bress stated that the proposed legislation would place a flat ban on all parading, demonstrating, or picketing within any of the Capitol buildings. No challenges were made to this statement. In addition, he specifically stated before the House committee that "[t]his provision for the limitation within the building would probably be free from any constitutional attack." *Safety of Capitol Buildings and Grounds: Hearing on H.R. 13178 Before the House Comm. on Pub. Works,* 90th Cong., 1st Sess. 26 (1967).

During the Senate debate, Senator Cooper stated that:

[t]he provisions of the bill are directed to the Capitol and the buildings used by the Congress. It does not deal specifically with the Capitol Grounds. I thought it would be well

to provide legislation for protection of the Capitol Grounds, because some of the present statutes seem to be inadequate and also constitutionally doubtful. But we dealt with the buildings.

113 CONG.REC. 27982 (1967). At the preceding Senate hearing, Senator Jordan had remarked that there are many places where a dozen or less persons could be considered as "blocking justice" and that "six or eight people right at that door here could completely block the entrance into this room." *Security of the Capitol Buildings: Hearing on S. 2310 Before the Subcomm. on Pub. Bldgs. and Grounds of the Senate Comm. on Pub. Works,* 90th Cong., 1st Sess. 21 (1967).

Senator Young stated, "[t]he Congress of the United States must not have its work interfered with or unduly disturbed. Therefore, it is proper for Congress to prohibit demonstrations within the Capitol Building itself." 113 CONG.REC. at 27983. Senator Young, who like Senator Coo-

Section 9–112(b)(7) is reasonably drawn to proscribe conduct that would interfere with the ability of members of Congress to fulfill the duties of office. "The federal workplace, like any place of employment, exists to accomplish the business of the employer.... It follows that the Government has the right to exercise control over access to the federal workplace in order to avoid interruptions to the performance of the duties of its employees." *Cornelius, supra,* 473 U.S. at 805–06, 105 S.Ct. at 3450–51.

In *Rock Against Racism, supra,* the Supreme Court made it clear that, even in a *public* forum, a regulation of the time, place, or manner of protected speech "need not be the least restrictive or least intrusive means" of achieving the end sought. 491 U.S. at 798, 109 S.Ct. at 2757. The means chosen, however, cannot be "substantially broader than necessary to achieve the government's interest." *Id.* at 800, 109 S.Ct. at 2758. The means Congress adopted here, a ban on demonstrations, cannot be said to be substantially broader than necessary.[7] Although this

court's opinion in *Smith v. United States,* 445 A.2d 961 (D.C.1982) (en banc) dealt with the unique status of the White House, its observations concerning the potential of demonstrations are instructive. As we stated, "[p]rotests and politically motivated demonstrations inherently involve some degree of controversy. When controversy is flaunted before a large captive audience, there is always a chance for violence or unrest, however slight." *Id.* at 965.[8]

We also observe that the right to engage in demonstrations is not unlimited.

> The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message. Rarely will a nonpublic forum provide the only means of contact with a particular audience.

*Cornelius, supra,* 473 U.S. at 809, 105 S.Ct. at 3452 (citation omitted). This court in *Leiss v. United States,* 364 A.2d 803 (D.C.1976), *cert. denied,* 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977), adopted the alternative means of expression test

---

per, viewed a flat ban on demonstrations outside the buildings on the Capitol grounds as unconstitutional, clearly conveyed his view that a flat ban on all demonstrations *within* the Capitol building was a proper means of protecting Congress from interference with its work.

Similar statements and responses were voiced during the House debate. Mr. Cramer, an advocate for the bill, set forth his view that there should be an absolute prohibition against demonstrations in the Capitol buildings. Although Mr. Edwards expressed his view that the bill failed to accommodate "the basic right of the people to assemble peaceably and petition their government," he agreed with Mr. Fallon that the bill could prohibit dangerous, disorderly, or disruptive conduct and further clarified that "Congress can and should prohibit demonstrations within the Capitol buildings themselves." *Id.* at 29392.

As noted above, some of the aforementioned senators and congressmen spoke out against a flat ban upon such conduct on the Capitol grounds while favoring such a flat ban on demonstrations within the buildings. While the former provision was not deleted by Congress from the act it was in the process of amending, that provision was later declared unconstitutional by the judiciary. *Jeannette Rankin Brigade v. Chief of Capitol Police,* 137 U.S.App.D.C. 155, 421 F.2d 1090 (1969), *aff'd,* 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972).

**7.** We find further support for the reasonableness of this statute when we take into account the manner in which this court has construed it in *Wheelock v. United States,* 552 A.2d 503 (D.C.1988). There, we stated with regard to conduct in the Rotunda of the Capitol, an area open to the public and not restricted, that a general prohibition against demonstrating could not "constitute the basis for penalizing the exercise of ... constitutional rights unless it interfered with the rights of others to a greater degree than tourists do." *Id.* at 508. The effect of our holding here is to limit the application of *Wheelock* to conduct that occurs in the Rotunda or similar public and unrestricted areas of the Capitol buildings.

**8.** The dissent cites *Texas v. Johnson,* 491 U.S. 397, 407–10, 109 S.Ct. 2533, 2541–42, 105 L.Ed.2d 342 (1989), in support of its thesis that "protestors can be punished only for demonstrations which are *actually* disruptive." Dissent at 414 (emphasis in original). The dissent's reliance is misplaced. Restrictions that the Constitution places on a state's inhibition of expressive activity in public cannot be assumed to limit equally the power of Congress to protect its deliberations against potential disturbance by forbidding demonstrations in restricted areas of the Capitol buildings.

articulated by the Supreme Court in *Pell v. Procunier*, 417 U.S. 817, 823–24, 94 S.Ct. 2800, 2804–05, 41 L.Ed.2d 495 (1974). In *Leiss, supra,* because alternative means were available to the appellant for the continued exercise of his right to protest outside the gate to the White House instead of on the White House grounds, there was "no infringement of protected expression sufficient to countervail the government's interests in limiting appellant's activity." *Leiss, supra,* 364 A.2d at 808–09; *see also Smith, supra,* 445 A.2d at 966 (not unreasonable to limit access to the White House for touring purposes, as an alternate forum for protests and demonstrations is available outside the gates); *O'Brien v. United States,* 444 A.2d 946 (D.C.1982) (appellant had the option of distributing commercial leaflets in an alternative area approximately fifteen feet from the top of an escalator of a metro station). *See generally Wall, supra,* 521 A.2d at 1144; *Carson v. United States,* 419 A.2d 996 (D.C.1980).

■ The availability of an alternate forum is not a prerequisite to the imposition of otherwise reasonable restrictions on a nonpublic forum. Nevertheless, the ready availability of alternate forums to appellants here weakens their position. They could have demonstrated on the grounds just outside the Capitol buildings. *See Dellums v. Powell,* 184 U.S.App.D.C. 275, 303, 566 F.2d 167, 195 (1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978). Another alternative was the delivery of a letter or other form of written communication—a method used successfully by these very appellants to petition the Speaker of the House just moments before they began to unfurl their banner and chant. Numerous other alternatives to a demonstration in the restricted area immediately next to the Democratic door to the House floor were available to appellants. The availability of the alternatives together with the importance to the Congress of protecting the environment in which it legislates leads us to the conclusion that the statutory limitation on demonstrations is reasonable as applied to nonpublic forums within the Capitol buildings.

## III.

■ Having rejected appellants' argument that the trial court erred, either as a matter of statutory construction or Constitutional requirement, in failing to construe the statute to include the element of disruption of, or interference with, the conduct of Congressional business, we turn to the record to ascertain whether it supports the trial judge's general verdicts of guilt.[9]

We note first that it is clear that appellants engaged in the type of activity the statute expressly forbids—demonstrations in the Capitol building; defense counsel conceded at trial that the type of conduct engaged in by appellants constituted a demonstration. The following colloquy took place during defense counsel's examination of appellant Caplan:

[DEFENSE COUNSEL]:

Q. At the inception of the demonstration whereupon—

THE COURT: Counsel, you characterized it demonstration. You concede there was a demonstration?

[DEFENSE COUNSEL]: Sure.

THE COURT: Okay. All right.

[DEFENSE COUNSEL]:

Q. Your Honor—excuse me Mr. Caplan. With respect to the inception of the demonstration, which for these purposes I will characterize as pulling out the banner, the beginning of the pulling out of the banner, at that time were you ever warned to cease and desist those activities?

---

9. Because the parties did not request specific findings, the trial judge was not required to make them. Superior Court Criminal Rule 23(c), identical to Federal Rule of Criminal Procedure 23(c), provides:

In a case tried without a jury the Court shall make a general finding and shall in addition, on request made before the general finding, find the facts specially. Such findings may be oral. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact appear therein.

*See also United States v. Bolles,* 528 F.2d 1190, 1191 (4th Cir.1975).

**A. No.**[10]

Although section 9–112 does not explicitly define a "demonstration," another source offers guidance and confirms the wisdom of counsel's concession.

Regulations adopted by the Capitol Police define the term demonstration. Article XIX of the Regulation of Vehicular and Pedestrian Traffic on United States Capitol Grounds in Connection with Demonstration Activities [11] states the following:

As used in this article, the term "demonstration activity" means demonstrating, parading, picketing, speechmaking, holding of vigils, sit-ins, or other activities, conducted for the purposes of demonstrating approval or disapproval of governmental policies or practices (or lack thereof), expressing a view on public issues, or bringing into public notice any issue or other matter.

We deem this a useful definition of the word "demonstration" as it is ordinarily used. We observe that although it includes the words "or other activities," those words do not broaden the definition to include activities of every type. Under the familiar *ejusdem generis* rule,[12] the word "activities" as used in the above definition refers to actions in the same class with "parading, picketing, speech making" etc., and does not include such things as conversation conducted in ordinary tones.[13]

Under this definition and within the ordinary meaning of the word, the activity engaged in by appellants, before they began chanting, *i.e.,* the unfurling of a large banner outside the Democratic door to the House chamber, could reasonably be found to have been a demonstration, and the trial judge's general verdict cannot be questioned on the ground that the record does not support his finding that a demonstration took place.[14] Although ample evidence showed that appellants actually disturbed the conduct of the business of Congress, the trial judge did not have to make such a finding under the statute and refrained from so doing.[15]

10. See also the testimony of appellant Ruther that he had begun to demonstrate, as he understood the term.

11. This regulation was a part of a set adopted by the Capitol Police Board on June 1, 1983, under the authority of An Act to define the area of the United States Capitol Grounds, to regulate the use thereof, and for other purposes, ch. 221, 61 Stat. 314 (1947) (codified at 40 U.S.C. § 212b (1986)) (amending ch. 707, 60 Stat. 718 (1946)).

12. "[W]here general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." BLACK'S LAW DICTIONARY, 517 (6th ed. 1990).

13. The dissent would stretch the concept of demonstration to include the conversation of a lobbyist or the wearing of a T-shirt or a button with a political slogan. Such activities, of themselves, would not fall within a reasonable reading of the definition we have quoted.

14. We need not consider whether the demonstrators were immune from prosecution for any activities in which they engaged after they were arrested.

15. Appellants mistakenly rely upon *Abney v. United States,* 451 A.2d 78 (D.C.1982), for the proposition that a demonstration is allowed unless it actually interferes with the orderly processes or safety of Congress. *Abney,* however, dealt with a different regulation and statute, namely a provision of the Traffic Regulations for the United States Capitol Grounds and the unlawful entry statute of the District of Columbia. *Id.* at 79. Furthermore, this court focused its attention there on a distinct area outside of the Capitol building—the Capitol grounds.

Likewise, *Arshack v. United States,* 321 A.2d 845 (D.C.1974), is distinguishable from this case because it addressed a different provision of the statute, then D.C.Code § 9–123(b)(5), that prohibited an individual or group from willfully and knowingly impeding passage through or within any of the Capitol buildings. *Id.* at 848. Section 9–123(b)(5) was narrowly drawn to further a particular governmental interest:

insuring clear passage through the corridors for the public and the public servants in order that the latter might carry out their Constitutional duties and in order that the former might observe their government in action, and so that they too might be able to petition for redress of grievances.

*Id.* at 849. The purpose of section 9–112(b)(7) is broader: to avoid generally potential interference with or disturbance of the activities of Congress. Moreover, the location of the conduct at issue in *Arshack* was a corridor that was still available for use by the public (although divided into restricted and non-restricted areas) as opposed to a fully restricted corridor.

Appellants also argue that under the tourist standard enunciated in *Nicholson, supra* note 4, 184 U.S.App.D.C. at 305, 566 F.2d at 197, and applied by this court to conduct in the Rotunda of the Capitol in *Wheelock, supra,* their conduct was "not more disruptive than that normally caused by tourists, visitors or lobbyists." The short answer to this argument is that it does not apply in areas like the one involved here that are restricted as to the general public including tourists.

At issue in *Nicholson* was the validity of provisions relating to the Capitol Grounds, D.C.Code §§ 9–118 to 9–132. Appellants in that case stood on the center steps of the east front of the Capitol reading from the Congressional Record a list of individuals killed in the Vietnam War. 184 U.S.App. D.C. at 305, 566 F.2d at 197. The Capitol Police arrested appellants after they refused to comply with an order from the Chief of the Capitol Police that they leave. *Id.* The trial judge acknowledged that the Capitol Grounds statute "could not constitutionally be applied to enforce a policy of keeping off the Capitol Grounds groups of persons merely because they are controversial in character or because they seek to exercise First Amendment rights." *Id.* at 311, 566 F.2d at 203 (footnote omitted). The trial judge, however, restricted the scope of the statute to save it from uncon-

stitutionality by holding that it penalized only conduct that would be "more disruptive or more substantial (in degree or number) than that normally engaged in by tourists and others and routinely permitted *on the Grounds.*" *Id.* at 313 n. 22, 566 F.2d at 205 n. 22 (emphasis added).

*Nicholson* applied the tourist standard it enunciated to the Capitol grounds only. Our holding in *Wheelock* applied the tourist standard to an area of the Capitol building that is open to the public, *i.e.,* the rotunda. In this case, we deal with a restricted corridor that was closed to the public at the time, and to which access could then be gained only by showing a building access card. Thus, we hold that because tourists were not allowed in this corridor unless they had a building access card, the application of the tourist standard is inappropriate.

We are satisfied that after taking into consideration the purpose of this particular nonpublic forum and all surrounding circumstances, *see Cornelius, supra,* 473 U.S. at 809, 105 S.Ct. at 3452, the ban on all demonstrations in this particular nonpublic forum was reasonable and content neutral, and therefore constitutional.[16] We are similarly satisfied that the record supports the trial judge's general verdicts of guilt.[17]

16. Appellants do not argue explicitly that § 9–112(b)(7) is overbroad. Nonetheless, we note briefly that the limitations placed on the statute have contoured it, as it applies to the Capitol rotunda, so as to proscribe only demonstrations that involve conduct more disturbing than the actions of a tourist would normally be, while taking into consideration the right of the people to freedom of expression. *See Wheelock, supra,* 552 A.2d at 508 & n. 6; *Dellums, supra,* 184 U.S.App.D.C. at 303, 566 F.2d at 195; *Nicholson, supra,* 184 U.S.App.D.C. at 305, 566 F.2d at 197. Therefore, we are not faced with an overbreadth problem. *See Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988) (courts have a duty to apply a narrowing construction on the statute, if it is fairly possible, to save its constitutionality); *Brockett v. Spokane Arcades,* 472 U.S. 491, 503, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985) (same); *accord, Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383, 397, 108 S.Ct. 636, 644, 98 L.Ed.2d 782 (1988); *Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 576, 107 S.Ct. 2568, 2573, 96 L.Ed.2d 500

(1987) (citing *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)); *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973) ("facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute."); *Pearson, supra,* 581 A.2d at 358.

17. Our dissenting colleague would read our holding as equating "demonstration" with the expressing of views. *See, e.g.,* dissent at 414. That is not our holding. The dissent warns that our holding would make the Capitol Building a "First Amendment Free Zone." *Id.* While the phrase has a ring to it, it is an exaggeration to use it to describe this ban on demonstrations. There are many forms of expressive activity which do not fall within the definition of the word "demonstration" in its ordinary meaning, which is the meaning embraced in the definition that we employ. The appellants themselves, before resorting to a demonstration, spoke with an officer and arranged to deliver a

For the foregoing reasons, the general verdicts entered by the trial judge have not been shown to be vulnerable on legal or factual grounds, and appellants' convictions are

*Affirmed.*

ROGERS, Chief Judge, dissenting:

The majority construes D.C.Code § 9–112(b)(7) to prohibit in the United States Capitol building any "activit[y]" which is "conducted for the purposes of demonstrating approval or disapproval of governmental policies or practices (or lack thereof), expressing a view on public issues, or bringing into public notice any issue or other matter." Majority opinion at 408. The majority further concludes that this construction is constitutional, at least as applied to those portions of the Capitol that the government designates as "restricted areas." In my view, the majority's construction of the statute—which allows the government to treat the Capitol as a virtual "First Amendment Free Zone," *Board of Airport Comm'ners v. Jews for Jesus, Inc.,* 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987)—is both inconsistent with the legislative history and unconstitutional. Accordingly, I respectfully dissent.

The unique posture of this case must be emphasized. The trial judge was presented with conflicting evidence on the question whether the demonstrators were disruptive before their arrest. Several police officers testified that appellants chanted loudly before their arrest. Some of the appellants testified that they silently unfurled the banner and were immediately arrested, and that they did not begin chanting until after the police officers seized them. The trial judge explicitly declined to make a finding, however, on whether appellants were engaged in a disruptive demonstration before their arrest. The judge concluded that he did not need to make such a ruling because the statute prohibited all demonstrations, even those that were entirely peaceful.

Therefore, in order to affirm the majority must assume, for purposes of this appeal, that appellants were entirely peaceful before their arrest.[1] Under the posture of this case, we must decide (1) whether the statute proscribes peaceful expressive conduct, and if so, (2) whether such a prohibition is constitutional. The majority answers these questions in the affirmative. In my view, the majority errs in both conclusions.

A.

The statute provides that "[i]t shall be unlawful for any person or group of persons willfully and knowingly ... [t]o parade, demonstrate, or picket within any of the Capitol buildings." D.C.Code § 9–112(b)(7). The statute does not provide a more specific definition of the term "demonstrate," and the majority turns to a regulation promulgated pursuant to a different

petition to the Speaker of the House of Representatives, a form of expressive activity which is not a demonstration and is singled out for protection in the First Amendment. Essentially, our dissenting colleague says that under the Constitution Congress is powerless to protect itself against disturbances by enacting a law that sweeps more broadly than imposing sanctions on conduct that actually disturbs the work of the Congress. The power of Congress is not so limited. It can impose a broader ban in order to prevent the existence of circumstances which rationally can be viewed as creating a potential for disturbances. Such a ban can extend at least to preventing demonstrations in areas of the Capitol building in which restrictions have been imposed upon the presence of the general public. The non-public-forum analysis which we applied to the facts of this case deals with such an area. Indeed, if members of the public can be banned altogether from being present in a restricted area, it is apparent that they can be banned from demonstrating there.

1. While acknowledging that the trial judge "refrained" from resolving the evidentiary ambiguity regarding appellants' pre-arrest conduct, the majority nonetheless refers to controverted evidence that appellants caused a commotion. *See* Majority opinion at 401–402. Appellants' testimony, in addition to testimony of some of the police officers, contradicted that evidence. Because the trial judge explicitly declined to consider whether appellants were disruptive before their arrest, this evidence may not be relied upon.

statute, 40 U.S.C. § 212b (authorizing the Capitol Police Board to regulate traffic on the Capitol grounds), in construing the term. The legislative history of § 9–112(b)(7), however, makes clear that Congress did not intend so broad a ban as the majority now approves.

Congress' primary purpose in enacting § 9–112(b) was to respond to "a substantial increase in the number of incidents of excessive disruption or disorderly conduct" in the Capitol buildings. S.REP. No. 573, 90th Cong., 1st Sess. 2 (1967). During the floor debate members of Congress justified the need for the statute by describing several disruptive demonstrations. See 113 CONG. REC. 29,388 (1967) (statement of Representative Colmer) ("a group of misguided Puerto Ricans ... entered [the] Capitol Building itself and up there in the corner of the gallery they arose and began a holocaust of shooting and a general disturbance here in the Capitol itself. A number of the Members were shot"); id. (a group "forced the guards up against the walls, entered the gallery itself, and created a great disturbance in the deliberations of the Nation's business"); id. at 29,930 (statement of Representative Anderson) ("some students ... laid down upon the floor and began to kick and scream and carry on in a boisterous, disorderly and disgraceful fashion").

Congress was cognizant, however, of the need to balance its interest in preventing disruption with the people's rights "of freedom of expression and of assembly and the right to petition their Government." S.REP. No. 573, supra, at 2. Congress was also aware of the unique importance of protecting expressive activity at the Capitol. Hearings on S. 2310 Before the Subcomm. on Public Buildings and Grounds of the Senate Comm. on Public Works, 90th Cong., 1st Sess. [hereinafter Senate Hearings] at 18 (statement of David G.

Bress, United States Attorney for the District of Columbia) (indicating "the closer relationship of first amendment rights on the Capitol Grounds, ... including [the right to] petition to redress grievances"). As this court has recognized, " '[t]he United States Capitol is a unique situs for demonstration activity' and 'is a place traditionally open to the public—thousands visit each year—to which access cannot be denied broadly or absolutely, [a fact which must be weighed] against the government's interest in protecting against possible damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff.' " Wheelock v. United States, 552 A.2d 503, 506 (D.C.1988) (quoting Kroll v. United States, 590 F.Supp. 1282, 1289, 1290 (D.D.C.1983) (quoting Jeannette Rankin Brigade v. Chief of Capitol Police, 342 F.Supp. 575, 583–85 (D.D.C.), aff'd mem., 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972))). Through-out consideration of the legislation, the focus was to assure that Congress could function in an orderly and safe manner and to ban activity that would impede its work; nothing would suggest that Congress intended to ban any and all forms of expressive conduct in the Capitol buildings. See infra note 4 and accompanying text.

Given Congress' expressed purposes, the statutory term "demonstrate" is properly construed to apply only to expressive conduct which is disruptive because it is incompatible with the orderly functioning of Congress.[2] Thus, in order to be prosecuted under § 9–112(b)(7) for expressive conduct in a Capitol corridor, a person's behavior must be so disruptive as to be "incompatible with the normal activity" of the area in which his or her conduct occurs. Grayned v. City of Rockford, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972); cf. Wheelock, supra, 552 A.2d at 508 (demonstrators in the Capitol Rotunda can be prosecuted under § 9–112(b)(7) only if they "in-

---

**2.** This construction of the term "demonstrate" is supported by the legislative history in statements of both a proponent and an opponent of the bill. See 113 CONG.REC. 27,982–83 (statement of Senator Young) (Congress "must not have its work interfered with or unduly disturbed. Therefore, it is proper for Congress to prohibit

demonstrations within the Capitol building itself"); id. at 29,392 (statement of Mr. Edwards) (Congress "can prohibit any dangerous, disorderly or disruptive conduct. Therefore, Congress can and should prohibit demonstrations within the Capitol Buildings themselves").

terfere[ ] with the rights of others to a greater degree than tourists do"). Such behavior would have to be markedly different from the conduct of tourists and others (even lobbyists seeking to express views on legislation) who are routinely in the area.

Accordingly, in view of the conflicting evidence at trial regarding appellants' pre-arrest conduct, and the absence of any finding by the trial judge whether appellants' conduct was disruptive because incompatible with the orderly functioning of Congress, I would remand the case to the trial judge to determine whether appellants' conduct prior to their arrest was disruptive because incompatible with the orderly functioning of Congress.

### B.

The majority's construction of § 9–112(b)(7) is not only inconsistent with the legislative intent, it is also contrary to constitutional requirements. In *Wheelock, supra,* 552 A.2d 503, the court held—with respect to demonstrations in the Capitol Rotunda—that § 9–112(b)(7) must be subject to a narrowing construction in order to save it from constitutional infirmity. A similar limiting construction is necessary in the instant case.

In *Wheelock, supra,* the Capitol police closed the Capitol Rotunda in order to arrest a group of protestors who had staged a peaceful demonstration. Although the demonstrators were prosecuted for unlawful entry, the court noted that the convictions could only be upheld if there was some "legal factor establishing the [demonstrators'] lack of a legal right to remain" in the Capitol Rotunda. *Id.* at 505. The government argued that § 9–112(b)(7) provided the justification for the demonstrators' arrest. The court rejected that argu-

ment, and adopted a narrowing construction for § 9–112(b)(7) in order to save it from constitutional attack:

> As to the general prohibition against demonstrating [contained in § 9–112(b)(7) ], the seminal case in this area explains why appellants' conduct cannot constitute the basis for penalizing the exercise of their constitutional rights unless it interfered with the rights of others to a greater degree than tourists do.

*Id.* at 508 & n. 6 (citing *United States v. Nicholson,* 97 Daily Wash.L.Rptr. 1213 (July 17, 1969), *aff'd,* 263 A.2d 56 (D.C.1970), *appended to Dellums v. Powell,* 184 U.S.App.D.C. 275, 305, 566 F.2d 167, 197 (1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978)); [3] *see also United States v. Murphy,* 114 Daily Wash.L.Rptr. 2149 (Oct. 20, 1986) (Schwelb, J.) (granting judgments of acquittal to demonstrators in the Capitol Rotunda after applying *Nicholson* construction to § 9–112(b)(7)). Thus, with respect to demonstrations in the Capitol Rotunda, the court has limited the reach of § 9–112(b)(7) to conduct that interferes with the rights of others to a greater degree than tourists.

Although *Wheelock* involved a demonstration in the Capitol Rotunda, the rationale underlying *Wheelock* applies with equal force to expressive conduct in the Capitol corridor. As the majority concedes, a content neutral regulation which places incidental burdens on speech must be evaluated under the test enunciated by the United States Supreme Court in *United States v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968), which held that a statute not aimed at expression is constitutional only if "it furthers an important or substantial governmental interest; if the governmental inter-

---

**3.** In *Nicholson* the trial judge construed a similar statute, D.C.Code § 9–124 (1969), as applying only to "any group which is noisy, violent, armed, or disorderly in behavior; any group which has a purpose to interfere with the processes of the Congress, any Member of Congress, congressional employee, visitor, or tourist; any group which has the effect, by its presence, of interfering with the processes of the Congress, any Member of Congress, congres-

sional employee, visitor, or tourist; and any group which damages any part of the buildings, shrubbery, or plant life." 184 U.S.App.D.C. at 312–13, 566 F.2d at 204–05. "In each category, the conduct would have to be more disruptive or more substantial (in degree or number) than that normally engaged in by tourists and others routinely permitted on the Grounds." *Id.* at 313 n. 22, 566 F.2d at 205 n. 22.

est is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377, 88 S.Ct. at 1679; *see also Arshack v. United States,* 321 A.2d 845 (D.C.1974) (applying the *O'Brien* test to D.C.Code § 9–123(b)(5)).

Applying the *O'Brien* test to § 9–112(b)(7), the government interest offered in support of the statute is "to insure that Congress can transact its business in an orderly manner, without interference," while at the same time "to guarantee that there is no infringement on the rights of the people ... to assemble peaceably and to petition the Government for a redress of grievances." *Senate Hearings, supra,* at 1 (September 21, 1967) (statement of Senator Jordan, chairman of the Subcommittee).[4] The governmental interest in protecting Congress from such disruptive conduct is substantial and legitimate, and certainly applies to demonstrations in the Capitol corridor. *See Wheelock, supra,* 552 A.2d at 507 ("Congress has an indisputably legitimate interest in regulating the Capitol building to ensure the safety of legislators, employees, and visitors").

The problem with the majority's interpretation of § 9–112(b)(7), however, is that it views the statute as proscribing in the Capitol all expressive conduct that could be characterized as a "demonstration," regardless of whether the conduct interferes with the orderly conduct by Congress of its business. Although a content-neutral regulation need not adopt the "least restrictive means" in order to survive constitutional scrutiny, *Ward v. Rock Against Racism,* 491 U.S. 781, 797–98, 109 S.Ct. 2746, 2757–58, 105 L.Ed.2d 661 (1989), the government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance [the government's] goals." *Id.* at 799, 109 S.Ct. at 2758. Under the majority's interpretation, § 9–112(b)(7) would prohibit all corridor demonstrations, even those that pose no threat to the order and safety of the Congress. Such a construction sweeps far too broadly.[5]

The majority relies on *Smith v. United States,* 445 A.2d 961, 965 (D.C.1982) (en banc), for the proposition that demonstrations "inherently involve some degree of controversy. When controversy is flaunted before an unwilling audience, there is always a chance for violence or unrest, however slight." Majority opinion at 406 (quoting *Smith* ). As the majority recognizes, however, *Smith* dealt with the unique status of the White House.[6] In the quite

---

**4.** Throughout the legislative history of § 9–112, Congress expressed the importance of these "sometimes conflicting goals." S.Rep. No. 573, *supra,* at 2; *see id.* ("people with strong feelings must be assured of the rights of freedom of expression and of assembly and the right to petition their Government, but under no circumstances should the guarantee of these rights be extended to a license for a minority to delay, impede, or otherwise disrupt the orderly processes of the legislature"); H.Rep. No. 745, 90th Cong., 1st Sess. 2 (1967), U.S.Code Cong. & Admin.News 1967, pp. 1739, 1740 (same); *Senate Hearings, supra,* at 16 (statement of Senator Cooper) (§ 9–112(b) "is directed toward establishing reasonable rules under which we hope to protect the constitutional rights of people, and at the same time insure the orderly work of the Congress").

**5.** Indeed, the court in *Arshack, supra,* 321 A.2d 845 (D.C.1974), upheld the constitutionality of the prosecution under § 9–123(b)(5) (1973) ("[i]t shall be unlawful for any person ... willfully and knowingly ... to obstruct, or to im-

pede passage through or within ... any of the Capitol buildings"), noting that the ban obstructing the Capitol corridor placed incidental burdens on speech that were no greater than necessary to effectuate the governmental purpose. The majority's construction of § 9–112(b)(7), by contrast, bans speech that does not interfere with the function of Congress.

**6.** The *Smith* court explained that the defendants' argument in that case "might well be persuasive if we were dealing with *almost any other form of public property.*" 445 A.2d at 965 (emphasis added). Subsequent cases have reaffirmed that the *Smith* analysis applies only in the limited context of the White House. *See Boertje v. United States,* 569 A.2d 586, 589 (D.C.1989) ("The White House differs from all other properties owned by the United States government [and] the exercise of citizen's First Amendment right of free speech on the White House grounds may be regulated in a 'more stringent [manner] ... than would be tolerated on most other government properties'") (quoting *Smith, supra,* 445 A.2d at 965); *Hemmati v.*

different context of the Capitol building, the court in *Wheelock* made clear that the mere chance that a speaker's controversial views might prompt violence is an insufficient basis for prohibiting a peaceful, non-disruptive demonstration. *See Cohen v. California*, 403 U.S. 15, 22, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971) ("we do not think the fact that some unwilling 'listeners' in a public building may have been briefly exposed to [the offensive speech] can serve to justify this breach of the peace conviction ...."). Most recently, in *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), the United States Supreme Court rejected just such an argument as the majority makes:

> Texas claims that its interest in preventing breaches of the peace justifies Johnson's conviction for flag desecration. However, no disturbance of the peace actually occurred or threatened to occur because of Johnson's burning of the flag....
>
> [W]e have not permitted the government to assume that every expression of a provocative idea will incite a riot, but have instead required careful consideration of the actual circumstances surrounding such expression, asking whether the expression "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 [89 S.Ct. 1827, 1829, 23 L.Ed.2d 430] (1969) (reviewing circumstances surrounding rally and speeches by Ku Klux Klan). To accept [the] argument that

[the government] need only demonstrate "the potential for a breach of the peace," ... and that every flag-burning necessarily possesses that potential, would be to eviscerate our prior holding in *Brandenburg*.

*Id.* at 409, 109 S.Ct. at 2542. Thus, the government may not base an arrest on the *possibility* that the demonstration could become unruly; protestors can be punished only for demonstrations which are *actually* disruptive. The majority's conclusion that Congress can "prevent the existence of circumstances which rationally can be viewed as creating a potential for disturbances," majority opinion at 409 n. 17, is therefore contrary to the law.

## C.

The fact that appellants' conduct occurred in a "restricted area" does not change the analysis. Appellants were arrested not for being in a restricted area, but for demonstrating. The police officers testified without exception that appellants were placed under arrest—immediately after they began to unfurl the banner—for demonstrating in the Capitol building.[7] The fair import of the testimony is that appellants would not have been arrested if they had not attempted to unfurl the banner. Nor did the trial judge view this as a restricted area case.[8] This case therefore does not call into question the power of Congress to declare certain areas within the Capitol off limits to the general public, and to arrest those who refuse, after prop-

---

*United States*, 564 A.2d 739, 743 n. 7 (D.C.1989) ("*Smith* is one of a series of cases, dating back more than twenty years ..., in which we have repeatedly declared that the White House is unique").

**7.** *See* testimony of Officer William Turner ("At that point when he dropped and began chanting, he was demonstrating in the Capitol. We, you know, removed him from the area and placed him under arrest"); testimony of Officer William Hynes ("I knew that they were breaking the law at that point ... Demonstrating within the U.S. Capitol"); *id.* ("they were charged with demonstrating in the U.S. Capitol, not incommoding"); testimony of Officer Steven Wells (when asked "What caused you to arrest Ms. Markowitz on that date?" the officer

testified that he heard a chant and saw her with "several individuals sitting on the floor holding another" and he therefore "placed her under arrest at that time for demonstrating in the Capitol").

**8.** The trial judge found, as a preface to his ruling on the defendant's pretrial motion, that "the corridor in which [appellants] were stopped was then considered a 'secure area' or a 'restricted area'...." There is no indication in the trial judge's subsequent legal discussion, however, that this finding played any role in the decision to reject appellants' First Amendment defense, since he construed the statute to preclude all demonstrations in the Capitol building no matter where they take place. *See* trial judge's Memorandum Opinion and Order.

er warnings, to leave such areas. *See Arshack, supra,* 321 A.2d at 847–48.

The majority's focus on the "restricted area" in which appellants were arrested is therefore misplaced. Given the posture of the case, the court must assume that appellants were arrested for entirely peaceful, nondisruptive expressive conduct. The fact that this conduct occurred in a "restricted area" only has relevance if Congress is permitted to designate certain areas as "First Amendment Free Zones" in the United States Capitol building, in which a citizen is free to walk, but is not free to express views. The Supreme Court has made clear that even in a "nonpublic forum" the government is not permitted to go so far. *Board of Airport Comm'ners v. Jews for Jesus, Inc., supra,* 482 U.S. 569, 107 S.Ct. 2568.[9]

In *Jews for Jesus,* a local resolution designated Los Angeles International Airport (LAX) as "not open for First Amendment activities by any individual and/or entity." *Id.* at 570, 107 S.Ct. at 2570. The Supreme Court concluded that the ordinance was unconstitutional:

> On its face, the resolution ... reaches the universe of expressive activity, and, by prohibiting *all* protected expression, purports to create a virtual "First Amendment Free Zone" at LAX. *The resolution does not merely regulate expressive activity in the Central Terminal Area that might create problems*

such as congestion or the disruption of the activities of those who use LAX ....
We think it obvious that such a ban cannot be justified even if LAX were a nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition of speech.

*Id.* at 574–75, 107 S.Ct. at 2571–73 (first emphasis in original, second emphasis added).

The majority's construction of § 9–112(b)(7) is equally broad and equally flawed. Instead of limiting the reach of the statute to expressive conduct which creates "congestion or the disruption of the activities of those who use" the Capitol, *id.* at 574, 107 S.Ct. at 2572, the majority construes the statute as prohibiting all speech "in the same class with 'parading, picketing, speech making,' etc." that occurs in a restricted area. Majority opinion at 408. Indeed, despite the majority's disclaimer to the contrary, it is difficult to understand why its construction of § 9–112(b)(7) would not reach "the wearing of a T-shirt or button that contains a political message," even though such conduct "is still protected speech even in a nonpublic forum." [10] *Id.* at 576, 107 S.Ct. at 2573. A lobbyist, likewise, would seem to be at risk. If a visitor to a municipal airport may not be punished for engaging in nondisruptive expressive conduct, then surely one who visits the United States Capitol, which is "a unique situs for demonstration activity," *Wheelock, supra,* 552 A.2d at 506 (quota-

---

9. The majority characterizes the area in which appellants were arrested as a "nonpublic forum." In my view, it makes no difference whether the corridor at issue is a traditional public forum, a designated public forum or a nonpublic forum. The Supreme Court has made clear that the three forum categories are of "limited utility" for evaluating the constitutionality of content-neutral time, place or manner restrictions. *City Council v. Taxpayers for Vincent,* 466 U.S. 789, 815 n. 32, 104 S.Ct. 2118, 2134 n. 32, 80 L.Ed.2d 772 (1984). For all three categories, a content-neutral restriction must be reasonably related to the government's legitimate purposes. *Compare Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 49, 103 S.Ct. 948, 957, 74 L.Ed.2d 794 (1983) (for a nonpublic forum, test is "whether [the statute is] reasonable in light of the purpose which the forum at issue serves") *and Wheelock, supra,*

552 A.2d at 506 n. 2 *and Community for Creative Non-violence v. Turner,* 282 U.S.App.D.C. 238, 248, 893 F.2d 1387, 1397 (1990) (Williams, J., concurring) (the "[same] substantive standards [for testing content-neutral regulations] are applied in every forum") *with Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 799–800, 105 S.Ct. 3439, 3447–3448, 87 L.Ed.2d 567 (1985) (applying different standards to *content-based* restrictions depending on the type of forum).

10. Wearing a T-shirt or button with a political slogan could be characterized as "other activities, conducted for the purposes of demonstrating approval or disapproval of governmental policies or practices (or lack thereof), expressing a view on public issues, or bringing into public notice any issue or other matter." Majority opinion at [408].

tion and citation omitted), is similarly protected.

The majority disclaims an intention to equate "demonstration" with all expressive activity. Thus, the majority concedes that neither wearing a T-shirt with a political slogan nor "conversation conducted in ordinary tones" would "fall within a reasonable reading of the definition" of § 9–112(b)(7). Majority opinion at 408 & n. 13, 409 n. 17. Given this concession, however, the majority's conclusion that appellants clearly engaged in a demonstration within the meaning of § 9–112(b)(7) seems puzzling. The majority relies on the fact that appellants "unfurl[ed] a large banner," but the posture of the case requires us to assume that appellants did so silently. If appellants, instead of unfurling a banner, had instead silently removed their jackets, revealing T-shirts covered with provocative political slogans, would the majority reach a different result? In attempting to distinguish between "banner" speech and other types of speech, the majority ends up drawing seemingly arbitrary lines.

The majority's limiting principle is that the statute only bans expressive conduct "in the same class with 'parading, picketing, speech making' etc." Majority opinion at 408. In addition to being disturbingly vague, this construction divorces the statute from its purpose of protecting Congress from disruptive conduct.[11] In my view, the majority errs in adopting a construction that turns on whether an individual's conduct falls into a "class" defined with little or no connection to the statutory purpose, especially since a much less troublesome construction is available. *See McIntosh v. Washington,* 395 A.2d 744, 757 (D.C.1978) (the court has a duty to adopt a construction that saves a law from constitutional attack). The more straightforward construction of § 9–112(b)(7)—indeed, the only construction consistent with the legislative history and constitutional requirements—is that the statute applies

only to conduct that is actually disruptive of the orderly functioning of Congress. Accordingly, I would remand the case for the trial judge to make a finding whether appellants' conduct was disruptive before their arrest.

---

11. The majority's construction arguably "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31

L.Ed.2d 110 (1972) (quoting *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954)). In addition, the standardless definition "encourages arbitrary and erratic arrests and convictions." *Id.* (citations omitted).